UNITED STATES of America,
Plaintiff,

v.

Mark D. LAY, Defendant.

No. 1:07 CR 339.

United States District Court,
N.D. Ohio,
Eastern Division.

May 13, 2008.

Andrew Friedman, Washington, DC, Percy Squire, The Law Offices of Squire & Pierre–Louis, LLC, Columbus, OH, Richard M. Kerger, Kerger & Associates, Toledo, OH, for Defendant.

Antoinette T. Bacon, Benita Y. Pearson, Office of the U.S. Attorney, Cleveland, OH, for Plaintiff.

*MEMORANDUM OPINION AND ORDER*

DOWD, District Judge.

## TABLE OF CONTENTS

I. Introduction ....................................................................652

II. A Time Line of Events in this Case .......................................652

III. Applicable Law—Standard of Review for Rule 29 and Rule 33 Motions ..........652
 A. Rule 29 of the Federal Rules of Criminal Procedure—Motion for Judgment of Acquittal ............................................................652

B. Rule 33 of the Federal Rules of Criminal Procedure—New Trial .......... 655

IV. Superseding Indictment ............................................... 655
 A. General Allegations .............................................. 655
 B. Count 1: Charging Investment Adviser Fraud (15 U.S.C. § 80b-6) ......... 658
 C. Count 2: Conspiracy to Commit or Attempt Mail and Wire Fraud (18 U.S.C. §§ 1341 & 1343; 18 U.S.C. § 1349) ............................ 659
 D. Counts 3 and 4: Mail Fraud/Aiding and Abetting (18 U.S.C. §§ 1341 and 2) ......................................................... 659
 E. Counts 2, 3 and 4 allege a violation of 18 U.S.C. §§ 1341, 1343, 1349 and 2 ......................................................... 659

V. A Summary of the Testimony of Three Major Witnesses for the Government, i.e., T.C. Gasper, James McLean and Jeremy Durgin ...................... 660
 A. Introduction ................................................... 660
 B. A Summary of the Testimony of T.C. Gasper and James McLean .......... 661
 C. Summary of the Testimony of FBI Agent Jeremy Durgin ................ 667

VI. Defendant's Rule 29 Motion for Acquittal ................................. 668

VII. Defendant's Rule 33 Motion for New Trial ................................ 672
 1. Failure to instruct the jury as a matter of law concerning the client investor and fiduciary duty ....................................... 672
 a. The defendant's first preserved objection with respect to instructions regarding client investor and fiduciary duty ........... 672
 b. The defendant's second preserved objection with respect to instructions regarding client investor and fiduciary duty ........... 673
 c. The defendant's third preserved objection with respect to instructions regarding client investor and fiduciary duty ........... 674
 d. The defendant's fourth preserved objection with respect to instructions regarding client investor and fiduciary duty ........... 674
 2. Refusal of the Court to allow impeachment of Messrs. Gasper and McLean concerning unlawful and negligent actions of the OBWC ..... 676
 3. Refusal to allow use of documents related to Mr. McLean's appeal to the State Personnel Board of Review to impeach him .................. 676
 4. Permitting the government to constantly refer to the OBWC as a victim and to its role in helping injured workers, but preventing defendant from referring to the OBWC's unlawful actions, such as investing in hedge funds and crimes by its employees .................. 676
 5. Refusal to admit minutes of the August 14, 2004 meeting of the OBWC oversight committee where Mr. McLean stated the OBWC had no hedge fund investments ......................................... 676
 6. Refusal to admit the 2004 version of the OBWC investment policies and guidelines authorizing hedge fund investments for the first time ..... 677
 7. Upon reading Mark Lay's civil deposition testimony to the jury after deliberations began, refusal to give limiting instructions required by *United States v. Marwin Smith*, 419 F.3d 521 (6th Cir.2005) cautioning the jury not to place too much emphasis on the testimony or take it out of context ................................................. 677
 8. Failure to rule on objections in Mark Lay's deposition prior to reading it to the jury ................................................... 678
 9. Failure to advise the jury as a matter of law that the PPM guidelines were revised on May 18, 2004 ..................................... 678
 9a. The defendant's cumulative error claim ............................. 678

VIII. Conclusion ......................................................... 679

| Description | Appendix No. |
|---|---|
| Superseding Indictment | 1 |
| Government's Exhibit 3011 | 2 |
| Court's Jury Instructions 13–26 | 3 |
| Defendant's Proposed Jury Instructions (Docket No. 94) | 4 |
| Trial Witness Log * | 5 |

## I. Introduction

The defendant, convicted of the four counts in the superseding indictment, has filed a motion pursuant to Rule 29 of the Criminal Rules of Procedure seeking an acquittal, or in the alternative, a new trial. The defendant awaits sentencing now scheduled for May 27, 2008.

## II. A Time Line of Events in this Case

The indictment was returned against the defendant on June 14, 2007, setting forth four counts. The defendant was eventually arraigned on July 2, 2007, entered pleas of not guilty and trial was scheduled for September 4, 2007.

On September 7, 2007, a superseding indictment was filed, again setting forth four counts.[1] The earlier trial date of September 4, 2007, was vacated.

Earlier, on July 30, 2007, the defendant filed a motion to dismiss (Docket No. 31) and then filed an amended motion to dismiss on July 31, 2007 (Docket No. 32). The government filed its response in opposition on August 13, 2007 (Docket No. 40). The Court entertained oral argument on the defendant's motion to dismiss. A transcript of the argument regarding the motion to dismiss was subsequently filed on September 10, 2007. (Docket No. 56). The Court filed its memorandum opinion

denying the amended motion to dismiss on September 27, 2007. (Docket No. 68).

The trial began on October 12, 2007, with the selection of a jury. The trial commenced on October 15, 2007, and concluded with guilty verdicts returned by the jury on October 30, 2007. In addition, the jury returned a verdict regarding the issue of forfeiture, finding that the proceeds obtained and subject to forfeiture constituted the sum of $590,526.23.

## III. Applicable Law—Standard of Review for Rule 29 and Rule 33 Motions

A. *Rule 29 of the Federal Rules of Criminal Procedure—Motion for Judgment of Acquittal*

A motion for judgment of acquittal should be denied if the Court determines that, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Mackey*, 265 F.3d 457, 460 (6th Cir.2001)(quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979))(emphasis in original). When viewing the evidence by this standard, the Court may not make independent determinations regarding witness credibility or the weight that should be accorded to the evidence. *United States v. Abdullah*, 162

---

* Note: The Court has attached as Appendix 5 the Trial Witness Log to assist appellate review. The jury was impaneled on October 12, 2007. Trial *testimony began on October 15, 2007.* The jury returned its guilty verdicts on October 30, 2007. Prior to the return of the jury verdict, transcripts of the testimony of Terrence Gasper and James McLean were filed on October 25, 2007. See Dockets 100,

101 and 102. As a consequence, there is no single transcript of testimony of the many witnesses in this case. As it developed, testimony of witnesses was filed by several court reporters, but not in sequence with respect to the testimony.

1. Appendix No. 1.

F.3d 897, 902–903 (6th Cir.1998)("we do not weigh the evidence presented, consider the credibility of witnesses, or substitute our judgment for that of the jury") (citing *United States v. Hilliard,* 11 F.3d 618, 620 (6th Cir.1993)). Instead, the Court must assume the truth of the evidence offered by the prosecution and give the government the benefit of all inferences that can be reasonably drawn therefrom. *United States v. Overmyer,* 867 F.2d 937, 939 (6th Cir.1989)("the court assumes the truth of the evidence offered by the prosecution") (quoting *United States v. Martinez,* 763 F.2d 1297, 1312 (11th Cir.1985)); *United States v. Abdullah,* at 903 ("[give] the government the benefit of all inferences that could be reasonably drawn from the testimony" (citing *Jackson v. Virginia* at 319, 99 S.Ct. 2781)).

B. *Rule 33 of the Federal Rules of Criminal Procedure—New Trial*

Rule 33 provides that "[u]pon defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Lay's motion for a new trial is based on insufficiency of the evidence and a series of errors that cumulatively warrant a new trial. Defendant contends the Court that the cumulative effect of nine errors produced a trial that was fundamentally unfair.

"Errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *United States v. Ashworth* 836 F.2d 260, 267 (6th Cir.1988) (quoting *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983), *cert. denied* 464 U.S.

951, 962, 104 S.Ct. 367, 396, 78 L.Ed.2d 327, 338 (1983)). However, when considering the cumulative effect of errors, the Court must guard against the "magnification" of errors which were of "little importance in their setting." *United States v. Ashworth* at 268 (quoting *Glasser v. United States,* 315 U.S. 60, 83, 62 S.Ct. 457, 86 L.Ed. 680 (1942)).

**IV. Superseding Indictment**

Against the *Jackson v. Virginia* standard test for a evaluating post-conviction motion for an acquittal, a summary of the superseding indictment is appropriate. In order to assist the reader, the footnotes in the summary identify the paragraph reference in the superseding indictment from which the summary is drawn, as well as evidence presented by the government at trial in support of those facts and allegations.[2] The superseding indictment is attached as Appendix 1 to this Memorandum Opinion.

A. *General Allegations*

The OBWC is a state agency which assists employers with expenses related to workplace injuries by providing medical and compensation benefits. During the time relevant to the superseding indictment, the OBWC's assets averaged $19 billion and were controlled by its Chief Financial Officer.[3]

Lay founded MDL Capital Management ("MDL") in 1992, and served as its Chairman, Co–CEO, principal shareholder, and Chief Investment Strategist. MDL was registered with the Securities and Exchange Commission ("SEC") as an investment adviser under the Investment Adviser's Act of 1940 ("the Act"), and provided

---

2. To further assist the reader, a list of trial witnesses and corresponding document number on the docket wherein the witness testimony is located, is attached as Appendix 5.

References to page numbers of witness testimony refers to the *transcript* page number.

3. Superseding indictment, ¶ 1–2; Testimony of T.C. Gasper, Docket No. 102, pp. 5 & 13.

investment adviser services.[4] SEC registered investment advisers, and their officers and directors, have a fiduciary duty to their clients, which includes acting in good faith in the best interest of the client, making full and fair disclosure of material facts regarding the investment relationship, and employing reasonable care to avoid misleading the client.[5]

In May 1998, the OBWC entered into an Investment Management Agreement with MDL. This agreement retained MDL to manage the OBWC's Long Fund, and established MDL as an investment adviser under the Act.[6] The OBWC allocated $355 million to the Long Fund for management by MDL, and paid MDL almost $2 million from 1998 to April 2005 in management fees for the Long Fund.[7]

In May 2002, Lay founded the MDL Active Duration Fund ("ADF") in Bermuda, which consisted primarily of government, corporate, and mortgage-backed securities. Lay and MDL's president were members of the ADF Board of Directors, and MDL was retained by the ADF board to serve as investment adviser to the ADF by an Investment Advisory Agreement.

The terms and conditions of the ADF investment vehicle were outlined in a Private Placement Memorandum ("PPM"). The PPM contained a variety of information, including Lay's employment credentials, various statements regarding the use of leverage of the ADF's assets, and required investor clients payments to MDL for management of the ADF. The PPM was provided to potential investors in the ADF, including the OBWC.[8]

The employment credentials provided in the PPM for Lay—who was identified as one with primary responsibility for ADF investment decisions—were false, and concealed from the OBWC some of Lay's prior employers and the reason for his separation from those employers.[9] With respect to the use of leverage, the PPM provided that "up to 150% of the Fund's assets, at the time of investment, may be leveraged...." This leverage limitation applied to all ADF assets, including United States Treasury Securities.[10] The OBWC paid MDL almost $1.8 million in fees for its services related to the OBWC's investment in the ADF. This fee was paid in

4. Superseding indictment, ¶ 3–5; Testimony of T.C. Gasper, Docket No. 102, p. 61; Testimony of Scott Fisher, Docket No. 127, p. 252; Testimony of Sophia M. Smith (Court Reporter), regarding transcript of Mark Lay's deposition, Docket No. 120, p. 159.

5. Superseding indictment, ¶ 7–8; Testimony of Lee Fensterstock, Docket No. 143, p. 377.

6. Superseding indictment, ¶ 9–10; Testimony of T.C. Gasper, Docket No. 102, pp. 18–25.

7. Superseding indictment, ¶ 13–14; Testimony of T.C. Gasper, Docket No. 102, p. 49; Testimony of Robert Lang, Docket No. 127, pp. 169–170 (Exhibit 8003–2).

8. Superseding indictment, ¶ 15–21. There are multiple versions of the PPM. The indictment alleges that the version of the PPM

provided to the OBWC was dated January 15, 2003. See superseding indictment, ¶ 22. Exhibit 281–3 et seq. (testified to by Robert Lang) and Exhibit 6–1 et seq. (testified to by T.C. Gasper) are identical and is the version of the PPM that was provided to the OBWC. See also Testimony of Sophia M. Smith (Court Reporter), regarding transcript of Mark Lay, Docket No. 120, p. 153–154.

9. Superseding indictment, ¶ 21. The defendant challenged the admission of evidence related to prior conduct of the defendant. The Court oversaw the deposition of Steven Peras regarding this issue. The Court ultimately concluded that the government could not use this evidence in its case-in-chief. The defendant did not testify, therefore, this evidence was never introduced at trial.

10. Superseding indictment, ¶ 22; Exhibit 281–24.

addition to the fee the OBWC paid MDL for its services related to the Long Fund.[11]

Lay, with encouragement from T.C. Gasper, successfully solicited the OBWC to invest in the ADF. In September 2003, the OBWC electronically transferred $100 million from the Long Fund to the ADF. During the time period relevant to the superseding indictment, the OBWC was the sole investor in the ADF.[12]

Lay directed the trading activity of the ADF during the period of time of OBWC's investment. He did so through the use of brokerage services both inside and outside the State of Ohio, and utilized the telephone, e-mail and mail services to carry out these transactions. Contrary to the guideline terms of the PPM, Lay leveraged the ADF's assets—which consisted solely of OBWC funds—far in excess of the 150% leverage limitation contained in the PPM. Lay, MDL, and others provided reports to the OBWC regarding the ADF, but none of the reports reflected the amount of leverage exercised in the ADF. Lay's excess leverage of ADF assets violated his fiduciary role as an investment adviser to act in the best interest of his client, the OBWC.[13]

The OBWC met with Lay in mid-April 2004 because it was concerned about a $7 million decline in the value of the ADF. At that meeting, Lay did not tell the OBWC that the ADF was leveraged well beyond the 150% limitation in the PPM, and concealed from the OBWC the ADF's actual losses, which were $32 million.[14] The OBWC learned for the first time in May 2004 that the ADF had lost $32 million when it received the April 2004 report. During the Spring of 2004, Lay concealed and misrepresented to the OBWC the true nature of the leverage being exercised in the ADF, and did not reveal to the OBWC that the ADF's losses were caused or magnified because he routinely exceeded the 150% leverage limit.[15] Despite the ADF's losses, and because of Lay's failure to disclose the extent of leverage he exercised with ADF investments, the OBWC transferred another $100 million from the Long Fund to the ADF in May 2004.[16]

After confronting Lay in May 2004 about the excessive leverage being utilized in the ADF, the ADF Board of Directors decided to amend the PPM's guidelines to sanction leverage in excess of 150%, but only for United States Treasury Securities; to notify the OBWC of the excess leverage that had already been used; and to seek the OBWC's approval for continued use of leverage in excess of 150%. In August 2004, the ADF Board sent a letter to the OBWC purporting to notify the OBWC of Lay's past and intended use of leverage in

---

11. Superseding indictment, ¶ 21; Testimony of Robert Lang, Docket No. 127, pp. 170–171; Exhibits 8003–1 and 8003–3.

12. Superseding indictment, ¶ 22–24; Testimony of T.C. Gasper, Docket No. 102, pp. 39, 42–44, 49; Testimony of Brian Sommers, Docket No. 120, p. 216 (Exhibit 10–10).

13. Superseding indictment, ¶ 25–31. Testimony of T.C. Gasper, Docket No. 102, pp. 30–31, 61, 85–86; Testimony of Jeremy Durgin, Docket No. 119, pp. 21, 23, 50; Testimony of James McLean, Docket No. 100, pp. 16–27 (Exhibits 2008–2016); Testimony of Robert Lang, Docket No. 127, pp. 179–180, 198.

14. Superseding indictment, ¶ 32–33. Testimony of James McLean, Docket No. 100, pp. 37–49.

15. Superseding indictment, ¶ 35. Testimony of James McLean, Docket No. 100, pp. 46–47, 82–84, 131–132; Testimony of Jeremy Durgin, Docket No. 119, pp. 23 & 29.

16. Superseding indictment, ¶ 36. Testimony of T.C. Gasper, Docket No. 102, pp. 78, 86–87.

excess of 150% and to secure its approval. However, the OBWC refused to permit excess leverage and refused to agree to the changes in the PPM.[17]

In mid-September 2004, the OBWC confronted Lay about the poor performance of the ADF. At that meeting, Lay admitted over-leveraging but falsely told the OBWC he had leveraged the ADF's assets approximately 900%, when he knew or should have known the ADF leverage exceeded 4,500%.[18]

By the time the OBWC learned that the ADF's losses were largely due to Lay's exercise of leverage in violation of the PPM, most of its $200 million investment in the ADF was lost. In an effort to avoid the total loss of its investment, the OBWC invested an additional $25 million in the ADF on September 23, 2004. But shortly thereafter, the OBWC formally requested a redemption of its investment in the ADF.[19] In October 2004, Lay attempted to obtain further investments from the OBWC in the ADF, but the OBWC refused. As a result of Lay's fraud and deceit upon the OBWC regarding leverage of the ADF well in excess of 150%, the OBWC recovered only $9 million from its $225 million investment.[20]

B. *Count 1: Charging Investment Adviser Fraud (15 U.S.C. § 80b–6)*

Sections 80b–6(1), (2) and (4) provide that:

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

. . . .

(4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

Count 1 of the superseding indictment alleges that, as an investment adviser registered with the SEC, MDL and its officers and employees—including Lay—owed a fiduciary obligation to its client, the OBWC. This fiduciary obligation included acting in good faith and in the best interest of the OBWC, fully and fairly disclosing all material facts regarding the investment relationship between MDL and the OBWC, and employing reasonable care to avoid misleading the OBWC.[21]

From September 2003 through January 2005, Lay and others used the mails, wires and other means of interstate and foreign commerce to engage in a various schemes, transactions and acts to defraud, deceive

---

17. Superseding indictment, ¶ 37–39. Testimony of James McLean, Docket No. 100, pp. 82–86; Testimony of T.C. Gasper, Docket No. 102, p. 75.

18. Superseding indictment, ¶ 40. Testimony of T.C. Gasper, Docket No. 102, pp. 79–80.

19. Superseding indictment, ¶ 41–43. Testimony of T.C. Gasper, Docket No. 102, pp. 91–

98; Testimony of James McLean, Docket No. 100, p. 101.

20. Superseding indictment, ¶ 45. Testimony of James McLean, Docket No. 100, pp. 134–135.

21. Superseding indictment, count 1, ¶ 2.

and manipulate the OBWC, and thereby the ADF, by exercising leverage in excess of 150% in violation of the PPM, and concealing and failing to disclose the full extent of his exercise of leverage in excess of 150%.[22]

### C. Count 2: Conspiracy to Commit or Attempt Mail and Wire Fraud (18 U.S.C. §§ 1341 & 1343; 18 U.S.C. § 1349)

From September 2003 through January 2005, Lay knowingly and willfully conspired with others to defraud, deceive, and manipulate the OBWC regarding a material matter, and to obtain money and property by false and fraudulent means utilizing the postal service, commercial interstate carrier, and transmission by wire for the purpose defrauding, deceiving and manipulating the OBWC regarding the ADF, including the amount of leverage exercised, the impact of leverage on the ADF's value, and the management team and administration of the ADF.

In furtherance of the scheme to defraud, Lay: 1) caused false employment credentials to be included in the PPM which falsely stated his employment history in an effort to conceal certain past employers and his reasons for separation from these employers from the OBWC and others who relied on the PPM;[23] 2) caused documents and information which resulted in execution of investment transactions which caused leverage of the ADF to exceed 150% to be delivered and transmitted interstate; 3) concealed the true nature and effect of leverage of the ADF in excess of 150% by failing to disclose the use of excess leverage and its effect on the OBWC's investment in the ADF; and 4) made false statements to others regarding the OBWC's knowledge of and consent to the use of excessive leveraging and regarding the OBWC's commitment to make additional investments in the ADF.

In addition, Lay and others caused various trade confirmation statements to be mailed and delivered by commercial interstate carrier, and caused various communications to be transmitted by wire in interstate and foreign commerce in order to execute or attempt to execute the scheme to defraud, deceive, and manipulate the OBWC.

### D. Counts 3 and 4: Mail Fraud/Aiding and Abetting (18 U.S.C. §§ 1341 and 2)

From September 2003 through January 2005, Lay, having devised a scheme to defraud the OBWC as to a material matter and to obtain money and property by false and fraudulent circumstances, used the postal service and commercial interstate carrier to mail and deliver certain trade confirmations related to the ADF.

### E. Counts 2, 3 and 4 allege a violation of 18 U.S.C. §§ 1341, 1343, 1349 and 2

§ 1341. Frauds and swindles

*Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, securi-*

---

**22.** Superseding indictment, count 1, ¶ 3.

**23.** As previously indicated, the Court declined the government's attempt to offer testimony to the effect that the PPM falsely stated Lay's

employment history in an effort to conceal certain past employers and his reasons for separation from those employers from the OBWC and others who relied on the PPM.

ty, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1, 000, 000 or imprisoned not more than 30 years, or both.

§ 1343. Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1, 000, 000 or imprisoned not more than 30 years, or both.

§ 1349. Attempt and conspiracy

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

§ 2. Principals

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

## V. A Summary of the Testimony of Three Major Witnesses for the Government, i.e., T.C. Gasper, James McLean and Jeremy Durgin

### A. Introduction

At this point in the analysis, the Court is of the view that a summary of the government's three major witnesses with respect to the factual background and the OBWC's relationship with defendant and the investment in the ADF will further assist the reader in understanding the evidence presented by the government in support of the allegations in the superseding indictment.

The essence of the prosecution's case, in support of the charge contained in count 1 of the superseding indictment, was to the effect that following the initial 1998 placement of $335 million with the defendant for investment in the Long Fund, a subsequent agreement between the defendant Mark Lay and T.C. Gasper, the chief financial officer of the OBWC, eventually led to the movement of $200 million from the Long Fund to the ADF (Active Duration Fund), a modified hedge fund in which leveraging of the funds of the OBWC in

the Active Duration Fund would be limited to 150%. The government's case then proceeded to demonstrate, contrary to the 150% limitation on leveraging, that the use of leveraging in the ADF, far in excess of 150%, eventually led to a loss of over $200 million to the OBWC. The three primary witnesses in support of the government's case with respect to count 1 included T.C. Gasper, the chief financial officer for the OBWC, James McLean, the chief investment officer for the OBWC and Jeremy Durgin, an FBI agent, who tracked the extensive leveraging.

B. *A Summary of the Testimony of T.C. Gasper and James McLean*

The OBWC, in its efforts to place its vast sums in income earning securities,[24] began a relationship with the defendant in 1998.[25] The description of the policy regarding the use of outside money managers by OBWC after the change in policy

24. In 1995, OBWC abandoned its internal management of its assets and turned to outside managers to invest OBWC funds. See testimony of T.C. Gasper, Docket No. 102, p. 17.

25. The testimony of T.C. Gasper, Docket No. 102, p. 19, line 18, through p. 21, line 2 follows:

Q. Sir, have you had occasion to become aware of a company called MDL Capital Management?
A. Yes.
Q. And do you know whether or not MDL managed the money for the Bureau?
A. Yes, it did.
Q. And who was the principal of MDL during the time it managed the money for the bureau?
A. Mark Lay was the principal.
Q. What was your understanding of Mr. Lay's role at MDL Capital Management relative to the money being managed for the Bureau?
A. When MDL was retained, I believe it was in 1998 as one of the core bond managers under the minority investment management program at the OBWC, it

was summarized by T.C. Gasper in the following exchange at Docket No. 102, page 34, line 23 through line 24 on page 35:

Q. Now, I would like to talk with you just a little bit more about managers and how many of them, for instance, did the Bureau hire?

A. Over the course of the nine years that I was at the Bureau, we had as many as 150 managers running as I said as much as 20 to 22 billion dollars. Among them, we had a very diversified policy at the OBWC. We had all different kinds of stocks and bonds being managed. We had domestic stocks, international stocks, we had private equity participations. It was about 150 managers.

Part of the reason for the high number was our minority and emerging manager policies. I mentioned the

was my understanding and the understanding of Mr. Cowman and other members of the investment department that Mr. Lay, who was the chief executive officer at MDL, was also far and away the primary decision maker relative to their strategies and how they ran their clients' money. When you were hiring MDL, you were hiring Mr. Lay.
Q. When the investment manager hiring decisions were made, were you a part of those?
A. I was indirectly involved in the some of the hiring decisions. By that time, Mr. Cowman was in charge of the investment department. We sent out what we call RFPs at this state level, these request for proposals, where we indicated what kind of managers we wanted and anyone can send in essentially an application to become a manager.
It was in that program that MDL submitted an RFP through Mr. Cowman's office. MDL was then approved as was the guideline in the investment policy was approved as a hireable manager by the investment subcommittee of that Oversight Commission. [sic]

minority policy before looking at 10 percent of our assets being managed by minorities.

At the time, most minority firms were smaller firms, so in order to give that much of an allocation to them, you had to give it in relatively small pieces. Our emerging managers were defined by the size of their assets. Frankly, that was a way for us to try to give some money to female-owned organizations that did not qualify under the state minority laws.

Again, those are also small firms for the most part, so between the two of them, that 150 managers, we probably had 60 or 70 managers that were minority managers or emerging managers, and there were probably 20 or 25 managers that probably controlled 80/85 percent of the Bureau's funds.

The defendant was the founder, chairman and chief investment strategist of MDL Capital Management Inc. which was registered with the United States Securities and Exchange Commission as an investment adviser.[26] The relationship began when OBWC invested substantial sums of money in the Long Fund managed by the defendant.[27] OBWC paid significant investment fees to the defendant's company for its work in investing the monies in the Long Fund.[28]

In 2002, the OBWC decided to modify its policy to allow investment in financial derivatives in order to hedge assets. The change was described by T.C. Gasper in the testimony at Docket No. 102, page 41, line 14 through line 5 on page 43:

Q. Did you have any discussions with Mr. Lay about a potential investment in the Active Duration Fund and the Bureau's policies?

A. Yes, we did. And relative to—let's start with the Bureau's policies. In mid year 2002, the external investment consultants were employed by the Bureau, and these consultants either reported to me or to Mr. Cowman, and they reported jointly to the administrator and to the chairman of that Oversight Commission, and the idea there was so that those two most senior people would have somebody to talk to about investment issues and strategy and policy changes other than their own staff.

It was a checks and balances, you know, type of policy there. Well, in mid 2002, they submitted a report based on the request from the chairman of the Oversight Commission. They submitted a report to the Bureau to the Oversight Commission in a public meeting that the Bureau started [sic] to consider alternative investments such as hedge funds and financial derivatives and the use of such funds to help control the risk of running the overall state insurance fund. In the fall of '02, in September, at the Oversight Commission meeting that was held, and the Oversight Commission meetings were monthly and they were public meetings, Mr. Cowman had recommended a change to the investment policy that would, in fact, allow the use of financial derivatives for the first time the use of financial

26. See Exhibit 1 for a copy of the formal investment agreement between MDL and the OBWC.

27. Initially, all the funds of the OBWC invested with MDL were in the core bond fund, sometimes also referred to as the Long Fund.

Testimony of T.C. Gasper, Docket No. 102, p. 34.

28. Testimony of Robert Lang, Docket No. 127, p. 170; Exhibit 8003–2.

derivatives in order to hedge assets that the state insurance fund held. That was approved. It was a one-line addition to the investment policy. It was approved in September of '02. Subsequent to that, I had conversation both with Mr. Lay and with a gentleman who was aiding Mr. Lay in marketing his product, a broker dealer in Cleveland, Ohio, and I indicated to both that person and to Mr. Lay that there was the possibility since we had changed the investment policy in September, there was a possibility that we might be able to do something with Mr. Lay or MDL or however that evolved, that we might be able to do something in the way of a hedge fund to hedge the bonds that MDL held in their core portfolio since our policy now permitted that.

Consequently, an agreement was reached with OBWC and MDL Capital Management wherein monies were shifted from the Long Fund to the hedge fund.[29]

The premise underlying T.C. Gasper's belief that switching some of the OBWC's funds from MDL's core portfolio (i.e., the Long Fund) to the hedge fund (the MDL Active Duration Fund) was advisable was the subject of the following testimony by T.C. Gasper at Docket No. 102, line 12 of page 48 through page 50, line 6.

Q. Now, sir, relative to the derivative that's used in this sentence and the terminology held in the portfolio, what was the manager to understand derivatives could be used against which portfolio being managed?

A. In all the discussion that Mr. Lay, Mr. White and myself and George Forbes, a member of the Oversight Commission had regarding the use of the ADF, our conversations centered on the ADF being used to hedge the bonds that were held in MDL's core portfolio.

We had discussed that over time we would get to a point where half of the money that ADL [sic] had under its control would be in the core portfolio, half would be in the ADF, so that by using the ADF, if they so desired, MDL could hedge all the bonds that they held in their core portfolio.

Q. Sir, when you use the term "hedge," what was your understanding of how the active duration fund would be used as a hedge against the core or the long fund?

A. My understanding was that if Mr. Lay felt that bond prices in general were going to decline since he had to remain invested in his core portfolio under our policy, that the ADF would be used to hedge those bonds that he held in the core portfolio; so that if the bond market did, in fact, go down in value, we would make some money in the ADF to offset the losses that we would have, the unrealized losses we would have suffered in the actual core portfolio. That was the intent of the discussion at all times subsequent to the change in the Bureau's investment policy.

Q. And approximately how much money of the Bureau's did MDL have in its core fund at the time you were considering investing in the active duration fund?

A. At that time, MDL had approximately, I believe, $400 million in their core portfolio. The idea was that we would get the ADF started by our taking 100 million out of the core portfolio and putting it into the ADF.

29. The hedge fund was identified as the MDL Active Duration Fund.

As I said, we had discussed and my intent was that eventually we would— what we hoped would be an appropriate time in the market, put another 100 million out of the core into the ADF so that we would have 200 million in each fund.

Q. Now sir, at any time when you were making decisions about authorizing money to be invested into the active duration fund, did you use any source of funds other than that already under the management of MDL?

A. No.

The government established that the OBWC lost over $200 million of its monies transferred from the Long Fund or core fund to the hedge fund (the MDL Active Duration Fund) and the losses resulted from excessive leveraging of the OBWC funds transferred from the Long Fund to the Active Duration Fund. Again, T.C. Gasper explained the term leverage in the following testimony and his understanding that the leveraging would be limited to 150%.[30]

Q. Now, the term "leverage" has come up. Do you know what that is, sir?

A. Yes.

Q. Can you briefly explain what leverage is?

A. Leverage is essentially taking a market position that reflects a value far in excess of assets that you actually hold. You take that market position, you leverage that position by borrowing money. It's no different from a home equity loan on your house.

A lender in the case of a hedge fund, it's typically an investment banker or broker, lends a manager money against the value of the hedge fund that they have and allows that manag-

er to then control market positions way beyond the money that they actually have in the fund.

It would be like, you know, going out and saying, I want to buy a house. I make $50,000 a year. You know, I probably ought to buy something for 100,000 or something of that nature, and say, well, I will see if I could borrow a couple million because I think that the markets are coming my way or I got a windfall coming.

Typically where you run into trouble is where the value of your collateral since nobody lends money that I am aware of without collateral, when the value of that collateral declines, if it does, for example, in the price of your home going down and that's less value for the bank that has your equity line or in the case of a market position, if the market goes against you, what happens is your lender will come back and say you need to put more cash in there. We need more value to support this leveraging.

Q. Now sir, did you have any discussion with Mr. Lay about how or whether leverage would be used in the active duration fund before you invested?

A. Yes, we did.

Q. Please tell us about those discussions.

A. Mr. Lay and I, Mr. Wright and I and Mr. Forbes and I all had discussions during the first half of 2003 reflecting that all we wanted to do was to help the fund get going with our initial investment and use our initial investment and the subsequent investment that I was planning on.

Remember I wanted to dump half our money into the ADF to hedge the

---

**30.** Testimony of T.C. Gasper, Docket No. 102, p. 50, line 7 through line 14, page 53.

bonds that Mr. Lay, that MDL held in their core portfolio. That was the only way we could approach utilizing the ADF because of what the wording in the policy change had been.

You can only use financial derivatives to hedge assets that you have in your portfolio. So that was the basis of the initial and all conversations that we had in 2003 prior to my signing the agreement in August of '03. This wasn't a secret among those of us who were discussing it. This was the plan. Hedge what we have, eventually put more monies into the hedge fund and so that we could hedge exactly what we had.

Eventually, we put 100 million in ADF and 300 million in the core fund, so technically, we could only [sic] 100 million of what was in the core fund. I wanted to get to the point where he could hedge his entire position if in the short run if he thought that would be profitable for the fund.

Q. Was there any expectation on your part, sir, that Mr.—the active duration hedge fund managed by Mr. Lay would hedge assets outside of those managed by MDL?

A. No.

Q. Sir, did you and Mr. Lay have specific discussions about the amount of leverage that would be used in the active duration account?

A. *Yes. When Mark and I spoke in the first half of '03, and I indicated how we would have to approach it, Mark told me that the fund would be set up, that we would be using leverage only to reflect the value of what he had in the fund, and then when I got the offering memorandum that he sent to me describing the leverage that would be used in the fund, it put in there as the guideline that the leverage would not exceed 150 percent or one and a half times the value of what was in the fund which was exactly what Mr. Lay and I had discussed.* (Emphasis added)

The fact that there was that extra half in there, the one and a half, I viewed that as a way to give him some flexibility in running money and moving monies around and the dollar amount of that extra 50 percent of value would not have been a material amount relative to the size of the overall bond portfolio at the Bureau.

Terrence Gasper gave extensive testimony during the trial of the defendant and indicated that the defendant had agreed to not engage in leveraging beyond 150% of the hedge fund's value. As a consequence, $100 million was initially transferred in September of 2003 from the Long Fund to the new fund described as the ADF Fund, i.e., the hedge fund.[31] A second $100 million was transferred from the Long Fund to the ADF Fund in May of 2004.[32] All of the funds in the ADF (Active Duration Fund) were transferred from the Long Fund to the ADF.

James McLean was hired by the OBWC as its chief investment officer in August of 2003. His primary responsibility included overseeing the $17 billion investment portfolio which included reviewing the performance of individual investment managers. As a consequence, he had the responsibility to review the performance of the defendant Mark Lay. By the time his duties began, including reviewing the performance of Mark Lay, the decision by T.C. Gasper to permit

---

**31.** Testimony of T.C. Gasper, Docket No. 102, p. 68, lines 14–25.

**32.** Testimony of T.C. Gasper, Docket No. 102, p. 69, line 12; p. 70, line 7.

the movement of monies from the Long Fund under the control of Mark Lay to the ADF Active Duration Fund had been made. For some months, McLean had the opportunity to review reports from Mark Lay which incorporated the activity of the Long Fund and also the Active Duration Fund.[33] The reports involving the Active Duration Fund were limited to one page and devoid of any reporting with respect to how the monies were being invested. The initial reports demonstrated that the asset value of the ADF remained close to the initial investment of $100 million.[34]

Beginning in early 2004, the defendant began exercising leverage in excess of 150% without disclosure to or the consent of the OBWC, which was the sole investor in the ADF. By April of 2004, the OBWC continued to receive reports that summarized the status of the ADF in one line, and demonstrated an unexplained $7 million loss in the ADF's value.[35] Subsequently, Jim McLean, the chief investment officer of the OBWC, discussed the loss with the defendant in a meeting in which the defendant neither stated nor admitted that he had exercised leverage well in excess of the 150% limitation as understood by the OBWC.[36]

By May of 2004, the board of directors of the ADF confronted the defendant about the losses and the leveraging beyond the 150% ceiling. Testimony at trial indicated that the defendant initially denied the excessive leveraging, but then told the

ADF board members that the OBWC was aware of the over-leveraging and had approved of the over-leveraging.[37]

Against that background, the ADF board of directors decided to revise the language of the PPM to remove the leverage limitation from trade involving the Untied States Treasury securities, to notify the OBWC that the defendant had exercised leverage in excess of 150% and to seek the approval of the OBWC of Lay's continued exercise of leverage in excess of 150%, and to seek ratification of his past leveraging practices.

Following the May 18, 2004 meeting of the ADF board of directors, on August 11, 2004, the ADF board issued a letter to the OBWC entitled "Recent Changes to MDL Active Duration Fund, LTD." The OBWC refused to approve the changes requested by the ADF board and so notified the ADF board.[38]

As time passed in the year 2004, the losses in the ADF increased, but the reports received by the OBWC continued to fail to identify the nature of the losses. During 2004, the ADF incurred huge losses, but the reporting to the OBWC was conducted in such a way that the OBWC had difficulty in determining the extent of its losses. By September 16, 2004, Terry Gasper and Jim McLean confronted the defendant because of concerns over ADF losses, lack of transparency, and over-leveraging.[39] During the meeting of September 16, the defendant finally admitted

---

33. Testimony of James McLean, Docket No. 100, pp. 17–27.

34. Testimony of Jeremy Durgin, Docket No. 119, pp. 63–64; Exhibit 3024.

35. Testimony of James McLean, Docket No. 100, p. 37, lines 9–22.

36. Testimony of James McLean, Docket No. 100, pp. 35–46.

37. Testimony of Robert Lang, Docket No. 126, p. 99; Exhibit 1104–1 through 1104–6.

38. Testimony of James McLean, Docket No. 100, pp. 85–89.

39. Testimony of T.C. Gasper, Docket No. 102, pp. 79–89; Testimony of James McLean, Docket No. 100, pp. 80–86.

having over-leveraged the ADF, but indicated that the over-leveraging was only approximately 400% to 600% of the ADF assets,[40] when in reality, as it later developed, the over-leveraging was almost 4,000%.[41] By that time, $200 million had been transferred from the Long Fund to the hedge fund.

By the time of the September 16 meeting, a proposed and revised PPM had been submitted to the OBWC eliminating the 150% limit on leveraging. Lay expressed the belief that the OBWC had approved the proposed and revised PPM, and when told that the OBWC would not approve the proposed and revised PPM, Lay responded, according to McLean, "I guess I am in trouble now." [42]

In sum, McLean's testimony supported the proposition that a single report was being received from Lay describing the condition of both the Long Fund and the ADF with minimal information about the nature of the investments in the ADF and with an absence of any indication that Lay was involved in excessive leveraging which led to the demise of OBWC's investment.

Later in September of 2004, the defendant advised the OBWC that if it did not invest an additional $25 million immediately, the entire fund would collapse. Against that background, the OBWC invested another $25 million, bringing the total investment to $225 million.[43] One week later, the OBWC formally requested a redemption of its investment in the hedge fund, requesting that the remaining balance be liquidated and distributed to the OBWC by the end of 2004.[44]

As of November, 2004, the OBWC had recovered approximately $9 million of its $225 million of its investment in the hedge fund.

### C. Summary of the Testimony of FBI Agent Jeremy Durgin

FBI Special Agent Jeremy Durgin tracked the trading activity of the funds in the ADF and presented multiple exhibits supporting his determination that Mark Lay had engaged in excessive leveraging ultimately resulting in a loss of over $214 million dollars. He attributed slightly over $2 million in loses to leveraging within the 150% limit and loses in excess of $212 million attributable to leveraging in excess of 150%.[45]

Durgin explained that the defendant, Mark Lay, used two levels of leveraging. One is called "short selling" and the other is called "going long". He primarily engaged in short selling, but in the long run, it did not matter whether Mark Lay sold short or went long. Both created debt.[46] In support of the scope and extent of the leveraging, the government presented a series of exhibits prepared by Durgin. Of particular relevance is government's Exhibit 3011 attached hereto as Appendix 2 demonstrating over the life of the ADF, leverage in excess of 150% grouped by trading days. Durgin testified that over the life of the ADF, only 37.9% of the

---

**40.** Testimony of T.C. Gasper, Docket No. 102, p. 80.

**41.** Testimony of Jeremy Durgin, Docket No. 119, pp. 58–89; Exhibit 3021.

**42.** Testimony of James McLean, Docket No. 100, p. 96.

**43.** Testimony of James McLean, Docket No. 100, p. 100, line 8 to p. 101, line 14.

**44.** Testimony of James McLean, Docket No. 100, p. 105, line 8 to p. 110, line 5.

**45.** Testimony of Jeremy Durgin, Docket No. 119, pp. 22–23; Exhibit 3015.

**46.** Testimony of Jeremy Durgin, Docket No. 119, pp. 28–29.

trades were within the 150% limit.[47] The remaining 62.1 % of the trades were over the 150% limit.[48] Some of the trades were between the range of 2,001 to 4,000%.[49] 3.8% of the trades, according to Durgin, were between 8,001 and 10,000%. Finally, according to Durgin, Lay exercised leverage in excess of 10,000% on 3.4% of the trade dates.[50]

## VI. Defendant's Rule 29 Motion for Acquittal

Lay argues in his motion for acquittal that there was insufficient evidence at trial to find that the government had proved the elements of the offenses charged beyond a reasonable doubt, and therefore the evidence cannot sustain a conviction.[51]

Counsel for the defendant repeatedly argued that it was a question of law for the Court to determine as to whether the OBWC was Lay's client with respect to ADF and that the Court should rule as a matter of law that the OBWC was not Lay's client. Secondly, counsel for the defendant argued that is was a question of law as to whether the defendant owed a fiduciary duty to the OBWC with respect to the ADF fund, and in that context, the Court should rule as a matter of law that

the defendant did not owe a fiduciary duty to the OBWC as to the ADF fund. The Court interprets the above dual claims to constitute an argument that the evidence, viewed in the light most favorable to the government, was insufficient as a matter of law to support the defendant's conviction under count 1.[52]

*Court's Ruling:* [53]

Count 1 of the superseding indictment alleges Investment Adviser Fraud in violation of 15 U.S.C. §§ 80b–6(1), (2) or (4). Sections 80b–6(1) and (2) provide that it is unlawful for an investment adviser to defraud a client or prospective client. Section 80b–6(4) provides that it is unlawful for an investment adviser to engage in "any act, practice or course of business which is fraudulent, deceptive, or manipulative," but does not depend on a client relationship.

Lay argues, as earlier indicated, that the OBWC was not his client and he owed no fiduciary duty to the OBWC in connection with its investment in the ADF, and that the Court should have determined as a matter of law that there was insufficient evidence of a client/fiduciary relationship between the OBWC and Lay with respect to OBWC's ADF investments.[54] In sup-

---

47. *Id.* at pp. 48–50

48. *Id.*

49. *Id.*

50. *Id.*

51. At the close of the government's case, the Court denied Lay's Rule 29 motion for dismissal. Trial Transcript, Docket No. 120, October 24, 2007, pp. 176–183. Defendant renewed his motion at the close of defendant's case, which was also denied.

52. The Court's instructions with respect to the elements as to count 1, which touched on the issue of both the client and fiduciary relationship are covered by Jury Instructions 13–26. See Appendix 3.

53. Defendant also raises this issue in connection with his motion for a new trial, which is discussed *infra.*

54. Lay has consistently argued throughout this case that his client was the ADF hedge fund, and not the OBWC investor, and cited *Goldstein v. SEC* in support. In Lay's deposition for the civil case related to his role with respect to OBWC's investments in the ADF, the transcript reflects that he repeatedly testified that the OBWC-not the ADF hedge fund-was his client. Testimony of Sophia M. Smith (Court Reporter), regarding transcript of Mark Lay's deposition, Docket No. 120, pp. 153–158.

port of his argument, Lay cites *Goldstein v. SEC*, 451 F.3d 873 (D.C.Cir.2006) [55] and the OBWC's execution of the ADF subscription agreement which, along with the PPM, provided that Lay was the investment adviser to the ADF.

In *Goldstein*, the SEC enacted a new rule that counted hedge fund investors as clients (in addition to the fund itself) in an effort to require registration by hedge fund investment advisers who may have previously been exempt from registration because they had fewer than fifteen clients. The *Goldstein* court addressed the scope of investment advisers' exemption from registration in § 203(b)(3) of the Advisers Act and the meaning of "client" as used in that section. The Court of Appeals' opinion contains a lengthy analysis of the meaning of "client" and characteristics of investment adviser relationships that mark a client relationship.

Noting that the Act does not contain a definition of "client," the *Goldstein* court discusses the Act's definition of investment adviser as any person who, for compensation, engages in the business of advising others regarding investments

" 'either *directly* or through publications or writings' 15 U.S.C. § 80b–2(11)(emphasis added) ... An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice *directly*. He invests a portion of his assets in the fund.... Having bought into the fund,

the investor fades into the background; his role is completely passive."

*Goldstein* at 879–880 (emphasis in original).

The *Goldstein* court noted that prior to the SEC's new rule attempting to count hedge fund investors as clients for the purpose of determining investor adviser registration requirements, the SEC explained that:

"a 'client of an investment adviser typically is provided with individualized advice that is based on the client's financial situation and investment objectives. In contrast, the investment adviser of an investment company need not consider the individual needs of the company's shareholders when making investment decisions, and thus has no obligation to ensure that each security purchased for the company's portfolio is an appropriate investment for each shareholder.' "

*Goldstein* at 880 (quoting Status of Investment Advisor Programs Under the Investment Company Act of 1940, 62 Fed.Reg. 15,098, 15, 012 (March 31, 1997)).

Noting that the United States Supreme Court in *Lowe v. SEC*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985) was construing an exception to the definition of "investment adviser" and not the meaning of "client," the *Goldstein* court pointed out that the Supreme Court in *Lowe*

"embraced a similar conception of the adviser-client relationship when it held ... that publishers of certain financial newsletters were not 'investment advis-

---

**55.** Related to Lay's argument that the Court should have instructed the jury as a matter of law that the OBWC was not his client with respect to ADF investments, Lay points to the SEC's new anti-fraud Rule 206(4)–8, which was enacted to clarify the SEC's ability to bring enforcement actions against investment advisers who defraud investors of hedge funds after *Goldstein*. In enacting the new rule, the SEC noted that the *Goldstein* court "distin-

guished sections 206(1) and (2) from 206(4) of the Advisers Act, which is not limited to conduct aimed at clients or prospective clients of investment advisers." Docket No. 147–2, p. 3. The government has alleged in count 1 that Lay violated Section 80b–6(4), which prohibits fraud by an investment adviser regardless of whether there is a client or prospective client relationship.

ers.' [*Lowe*] at 211, 105 S.Ct. 2557.... After an extensive discussion of the legislative history of the Advisers Act, the [*Lowe*] Court held that the existence of an advisory relationship depended largely on the character of the advice rendered. Persons engaged in the investment advisory profession 'provide personalized advice attuned to a client's concerns.' *Lowe,* 472 U.S. at 208, 105 S.Ct. 2557, 86 L.Ed.2d 130. '[F]iduciary, person-to-person relationships' were 'characteristic' of the 'investment adviser-client relationship[ ].' *Id.* at 210, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130.... This type of direct relationship exists between the adviser and the fund, but not between the adviser and the investors in the fund. The adviser is concerned with the fund's performance, not with each investor's financial performance."

*Goldstein* at 880.

In concluding that hedge fund investors are not clients of the fund's investment adviser, the *Goldstein* court observed that an investment adviser would inevitably face a conflict of interest if the adviser had a fiduciary duty to act in the client's best interest, and fully disclose material conflicts the adviser has with its clients, to *both* the fund and the fund's investors. *Goldstein* at 881. The Court of Appeals for the District of Columbia struck down the SEC's rule defining hedge fund investors as clients noting that while the SEC's effort to more comprehensively regulate hedge funds was understandable, it could not accomplish its objective by a "manipulation of meaning." "The Commission has, in short, not adequately explained how the *relationship* between hedge fund investors and advisers justifies treating the former as clients of the latter." *Goldstein* at 882 (emphasis added). The Court of Appeals was unpersuaded by the Commission's position that different classes of investors may have different rights or privileges with respect to their investments because "[t]his reveals little, however, about the *relationship* between the investment and the adviser. Even if it did, the Commission has not justified treating *all* investors in hedge funds as clients for the purpose of the rule. If there are certain characteristics present in some investor-adviser relationships that mark a "client" relationship, then the Commission should have identified those characteristics and tailored its rule accordingly." *Goldstein* at 882–883 (emphasis in original).

The facts of *Goldstein* and resulting conclusion that hedge fund investors are not clients of the fund adviser are very different than the circumstances of this case. The characteristics defining an adviser-client relationship were determined by the *Goldstein* court to ordinarily be absent in hedge fund scenarios, i.e., the investors do not receive investment advice directly from the adviser, the investor's role is passive, the adviser has no obligation to ensure that fund investment decisions are appropriate investments for each shareholder or obligation to disclose conflicts, and the adviser's advice is not attuned to an individual investor's concerns.

■ In this case, there is evidence in the record that the characteristics of an adviser-client relationship were present between defendant and the OBWC regarding the ADF. There is no dispute that the investor (OBWC) had a pre-existing fiduciary relationship separate and apart with the ADF's investment adviser (Lay). The OBWC was Lay's client and Lay was the OBWC's investment adviser with respect to the Long/core fund, which was invested in the ADF. There is no evidence in the record that Lay disclosed to the OBWC any conflict of interest regarding his relationship with them vis-a-vis the ADF.

There is evidence in the record that the purpose of the OBWC's investment in the ADF was to provide Lay with flexibility and investment management alternatives for half of the Long/core fund monies in order to reduce the overall risk to OBWC monies under Lay's control. The OBWC was the only shareholder in the ADF and all of the money invested by the OBWC in the ADF came from the Long/core fund, which was managed by the defendant.

Unlike the hedge fund investor scenario discussed in *Goldstein*, there is evidence in the record that the OBWC, as an investor in the ADF, did not have a passive role and fade into the background. There is evidence of regular and direct communication between Lay and the OBWC regarding Lay's ADF investment decisions, the OBWC's comfort with those investments, fund performance, and the role of those investments in the OBWC's overall financial objectives with respect to OBWC monies managed by Lay. There is evidence in the record that the purpose of the ADF investments was to benefit the OBWC—the sole shareholder—with respect to monies which Lay managed for the OBWC.

In this case, unlike *Goldstein*, there is evidence of relationship characteristics between the OBWC and Lay with respect to the Long/core fund investments in the ADF that could be found by a reasonable jury to mark a client and/or fiduciary relationship between the OBWC and Lay regarding the ADF investments. Lay's motion for acquittal on count 1 on the grounds that the Court should have determined as a matter of law that there was insufficient evidence in the record to support a finding by the jury of a client and/or fiduciary relationship between Lay and the OBWC, and therefore insufficient evidence to sustain a conviction under 15 U.S.C. §§ 80b-6(1), (2) or (4), is DENIED.

In addition to the primary basis for Lay's motion for acquittal just discussed, Lay raises six additional reasons for acquittal.[56] The Court finds that when viewing the evidence in the light most favorable to the government, there is sufficient evidence in the record from which the jury could have found the essential elements of counts 1, 2, 3, and 4 beyond a reasonable doubt. Therefore, defendant's motion with respect to the six additional grounds for acquittal is DENIED.

---

**56.** 1) The superseding indictment states that the ADF Board decided to revise the PPM language to allow leverage in excess of 150% for treasury securities, therefore there could be no violation of the leverage guidelines after May 18, 2004. (There is evidence in the record that the proposed leverage changes were never implemented. See Exhibit 1104–3; Testimony of T.C. Gasper, Docket No. 102, p. 75; Exhibit 1514.)

2) The OBWC violated its own investment policies and the ADF subscription agreement by investing in a hedge fund in September 2003. (See Section VII(4))

3) There is no evidence that the OBWC either parted with property or undertook action it would not have otherwise taken absent misrepresentations or omissions by Lay, which are necessary elements of counts 2, 3 and 4. (There is evidence in the record that the OBWC would not have transferred funds to

the ADF if aware of over-leveraging. See Testimony of T.C. Gasper, Docket No. 102, p. 87. See Exhibit 8003–3.)

4) The government's allegations in the superseding indictment and the jury charge improperly merge the roles of investor and client. (See Section VII(1))

5) There is no evidence that the mails were used to exceed the PPM's leverage guidelines as revised May 18, 2004, which is a necessary element of Counts 1, 2, 3 and 4. (There is evidence in the record that the mails were used in connection with over-leveraging. See Testimony of Dominick Buonocore, Docket No. 132, p. 443; Testimony of Michael Simmerly, Docket No. 132, pp. 452–460.)

6) There is no evidence to sustain the jury's forfeiture determination. (There is evidence in the record to support the jury's forfeiture determination. See Exhibit 8003–3.)

## VII. Defendant's Rule 33 Motion for New Trial

■ In addition to his arguments of insufficiency of evidence to sustain a conviction, Lay argues that he is entitled to a new trial in the interests of justice pursuant to Rule 33 of the Federal Rules of Criminal Procedure.[57] In particular, Lay identifies nine different factors in support of this aspect of his motion, and contends that the cumulative effect of these factors—rather than any single factor alone—resulted in a trial that was fundamentally unfair.[58] These nine factors are:

1. *Failure to instruct the jury as a matter of law concerning the client investor and fiduciary duty.*

*Court's Ruling:*

Counsel for the government proposed an extensive recommendation as to the jury instructions. The defendant's request for jury instructions was limited and a copy of the defendant's request for jury instructions is attached as Appendix 4.

The Court conducted a conference with counsel with respect to jury instructions on October 25, 2007. A transcript of those proceedings is in the record as Docket No. 141. During the October 25 hearing, the following discussion took place with respect to the defendant's relationship to OBWC as to the MDL Active Duration Fund:

a. The defendant's first preserved objection with respect to instructions regarding client investor and fiduciary duty.[59]

THE COURT: All right. Thank you.

Now, we have, we've discussed the charge in this case at length.[60] Not on the record, to facilitate the discussion. The charge as it is now, without counting the table of contents and not counting the verdict forms, is going to be approximate 93 or 94 pages long. So it's an extraordinarily lengthy jury instruction.

And the lawyers have discussed this charge at some length, and the lawyers on both sides are entitled to register objections, if they have those objections, so they preserve them for appeal purposes in the event there is a conviction.

And I have a very strong feeling that the counsel should have every right to

---

57. The defendant's brief (Docket No. 113) in support of his motion for a judgment of acquittal or a new trial is limited to a brief discussion of the motion for a new trial at pages 20 through 22. The subsequent reply of the defendant responding to the government's memorandum in opposition to the motion for a judgment of acquittal or a new trial was filed on March 5, 2008. See Docket No. 147. The defendant's reply with respect for the motion for a new trial was limited to the statement that "Mr. Lay reiterates the Rule 33 grounds set forth in his original motion as those stated herein."

58. Defendant cites *Walker v. Engle,* 703 F.2d 959, 963 (6th Cir.1983) and *United States v. Mackey,* 2007 WL 2859717 (6th Cir.) in support of his cumulative error argument.

59. See transcript for October 25, 2007, Docket No. 141 at pp. 8 & 9.

60. The Court follows the practice of instructing the jury before final argument in both civil and criminal cases. The Court attempts to avoid a lengthy delay between the end of testimony and the phase of the case involving the final instructions to the jury. Against that background, the Court conducts an informal discussion with counsel, not on the record, with respect to the proposed jury instructions because such a process usually results in an agreement by counsel as to necessary modifications of the charge. When it develops that there are objections that cannot be resolved, the Court then provides counsel the opportunity to place their objections on the record to preserve any issue for appeal. The Court followed that practice in this case.

set forth their objections in detail, and so I'll turn first to the defendant with respect to objections that you have. And it's my recollection that, what is at the bottom of page 36 that counsel for the defendant wanted me to add?

MR. KERGER: Your Honor, if I might I'm concerned the pagination may change.

THE COURT: But let me tell you where it is, because you are right, the pagination may change. But what's now called instruction 18 at page 36 says, who is a client? [61]

And then the court's proposed instruction in the fourth paragraph states: Quote, it is the defendant's position that he had two separate relationships with the OBWC.

With respect to the long fund, Mark Lay was the investment advisor to the OBWC and the OBWC was his client.

With respect to the MDL Active During Fund the defendant contends that he was the investment advisor to the MDL Active Duration Fund itself and had no investment advisor relationship with the OBWC; that is, the OBWC was not his client with respect to the OBWC's investment in the MDL Active Duration Fund.

*Now, as I understand, the government—excuse me—the defendant wishes me to add at the conclusion of that paragraph, probably another paragraph, that the OBWC, by virtue of signing a subscription agreement with the ADF, was an accredited investor of the ADF.*

*Have I correctly stated your wish?* (Emphasis added)

MR. SQUIRE: That is correct.

THE COURT: *And it's my understanding the government opposes that.* (Emphasis added)

MS. PEARSON: That is correct, your Honor.

THE COURT: *And the court has concluded that that instruction is not required and is a matter left to argument. And the court will deny the defendant's request.* (Emphasis added)

b. The defendant's second preserved objection with respect to instructions regarding client investor and fiduciary duty.[62]

MR. KERGER: Top of the next page, your Honor.

THE COURT: Yes, I'm just trying to find my notes here.

MR. KERGER: Mr. Squire can give them to you if you want, your Honor.

THE COURT: Well, there was also a request, as I understand it, that the paragraph on page 37, the largest paragraph that begins with the word "second. You could find that the government proved beyond a reasonable doubt that Mark Lay did have investment advisory client relationship with the OBWC with respect to the OBWC's investment in the MDL Active Duration Fund."

And then I go on to elaborate on that.

And it is my understanding that it's the motion of the defendant that that entire paragraph be eliminated. Is that correct?

MR. SQUIRE: No, your Honor, all that we wanted was the concluding phrase after two close parentheses where it

---

61. The Court's instruction as to "who is a client?" became Instruction 20 as contained in Appendix 3.

62. See transcript for October 25, 2007, Docket No. 141 at pp. 9–11.

says: "or that the investment adviser relationship" and those words follows.

THE COURT: Okay. You are just objecting to what follows two, which reads: "[Therefore you could find that: 1) Lay established a second investment adviser-client relationship with the OBWC and he was the investment adviser to the OBWC with respect to both the Long Fund and the MDL Active Duration Fund, or that 2) ] *the investment advisor relationship between Lay and the OBWC regarding the Long Fund was based on the investment of monies in the Long Fund, wherever it was invested, and was not severed when Long Fund monies were invested in the MDL Active Duration Fund."* (Emphasis added)

To that you take an objection?

MR. SQUIRE: Yes sir, just that second clause.

THE COURT: And the government's position is that it should remain?

MS. PEARSON: Yes, your Honor.

THE COURT: *I'm going to overrule the defendant's objection and continue that language in the instruction. So that objection is also preserved for the record.* (Emphasis added)

c. The defendant's third preserved objection with respect to instructions regarding client investor and fiduciary duty.[63]

MR. SQUIRE: And, your Honor, we did propose, this may be gotten muddled in the discussion, that there should be an addition to the opening paragraph of—that there should be about 9 or 10

words added, and I've written them out here.

MR. KERGER: The top of page 37?

MR. SQUIRE: At the tomorrow [sic] top of page 37.

That following the words in the first paragraph MDL.

THE COURT: Okay, the paragraph as its now structured is at the top of page 37, but it could change with the additions, subtractions, reads:

"It is the government's position in this case that the defendant Mark Lay had an investment advisor hyphen client relationship with the Ohio Bureau of Workers Compensation with respect to OBWC's investment in the MDL Active Duration Fund."

And then the defendant is requesting that the period where it says fund be changed to a comma, and then add "by reason of a 1998 investment advisor agreement between MDL and OBWC."

And you are asking that that language be added?[64]

MR. SQUIRE: Yes sir.

THE COURT: And the government's position?

MS. PEARSON: Is we object, your Honor.

THE COURT: *Well, I agree with the government and the defendant's objection is overruled. But it's preserved for the record.* (Emphasis added)

d. The defendant's fourth preserved objection with respect to instructions regarding client investor and fiduciary duty.

63. See transcript for October 25, 2007, Docket No. 141 at pp. 11 & 12.

64. The defendant's request for the additional language dealt with the first paragraph at the top of what is now page 36 and part of Instruction 20 dealing with the question of "who is a client?."

A further discussion ensured during the October 25 hearing during which the defendant preserved its objection with respect to the issue of client investor and fiduciary duty in the dialogue beginning at Docket No. 141, page 12 line 12, through line 23 on page 13.

> MR. KERGER: We object to the instruction under the subheading 15 U.S.C. Section 80b in it's entirety.[65]
>
> THE COURT: Were we modifying that?
>
> MR. KERGER: You were making additions. You were not inclined to follow our objection, but you added language, I believe, after "in connection with that investment which arose from".
>
> MS. PEARSON: "From his status as an investment advisor with the long fund."
>
> THE COURT: And where was that phrase again?
>
> MS. PEARSON: "In connection", right after that.
>
> MR. KERGER: It's the fifth line down.
>
> THE COURT: Okay, Yeah. And we are modifying that to add the phrase, I believe, that the government just related.
>
> You want to say that again?
>
> MS. PEARSON: Sure. "Which arose from his status as an investment advisor with the long fund."
>
> MR. KERGER: And our objection would continue even with the change, your Honor.
>
> THE COURT: The court will add that phrase, and overrules the defendant's objection. And the defendant's objection to the inclusion—the defendant objects to the inclusion of that phrase and also objects to the paragraph in its entirety, which has as the heading 15 U.S.C. Section 80b hyphen 6 paren 4 and begins with the phrase: "if you find that the Ohio Bureau of Workers Compensation was not Mark Lay's client as an investment adviser with respect to the OBWC's investment in the MDL Active Duration Fund", and then it goes on.
>
> And you are objecting to that entire paragraph?
>
> MR. KERGER: Yes.
>
> THE COURT: *The objection is preserved for the record and it is denied. and the objection to adding the additional language is also denied. and the objection is preserved for the record.*

---

**65.** The Court's Instruction 21 included a section under the heading of 15 U.S.C. Section 80b–6(4) which stated in its entirety as follows:

> If you find that the Ohio Bureau of Workers' Compensation was not Mark Lay's client as an investment adviser with respect to the OBWC's investment in the MDL Active Duration Fund, then it is a question of fact for you the jury to determine whether the defendant had any fiduciary duty to the OBWC in connection with that investment *which arose from his status as an investment adviser in connection with the Long Fund,* and whether he violated that fiduciary duty. As I instructed you above, if you determine that the defendant violated his fiduciary duty, the violation of that duty is a factor for you to consider in determining whether the government has proved beyond a reasonable doubt Element Two of Section 80b–6(4). My instruction to you regarding Element Two of Section 80b–6(4) follows at Instruction 24. A determination by you that Mark Lay violated his fiduciary duty is only a factor for you to consider regarding Element Two of Section 80b–6(4), and does not automatically mean that the government has met its burden of proof with respect to that element.

The defendant's objection went both to including in its entirety the instruction regarding 15 U.S.C. Section 80b–6(4) and secondarily, to the underlined language. The Court denied both objections.

2. *Refusal of the Court to allow impeachment of Messrs. Gasper and McLean concerning unlawful and negligent actions of the OBWC.*

*Court's Ruling:*

The government filed a pretrial motion in limine to prevent irrelevant, confusing and unfairly prejudicial testimony. See Docket No. 29.[66] In its response (Docket No. 38), counsel for the defendant indicated no objection to the granting of the motion as it related to any claim that the OBWC officers were negligent.[67] Consequently, the Court granted the government's pretrial motion in limine and removed any possible claim by the defendant to the effect that the issue of his guilt could in some fashion be negated by the contention that employees of the OBWC engaged in negligence. The Court finds that the defendant is bound by his pretrial agreement that the issue of negligence would not be permitted during the trial. As a result, the second basis for a new trial is without merit and is DENIED.

3. *Refusal to allow use of documents related to Mr. McLean's appeal to the State Personnel Board of Review to impeach him.*

*Court's Ruling:*

The government contends that the Court correctly sustained the government's objection to improper impeachment of its witness, James McLean. After reviewing the transcript of McLean's testimony at Docket No. 101, pages 185 through 188, the Court agrees and finds that the objection is not well taken and does not justify granting the defendant's motion for a new trial.

4. *Permitting the government to constantly refer to the OBWC as a victim and to its role in helping injured workers, but preventing defendant from referring to the OBWC's unlawful actions, such as investing in hedge funds and crimes by its employees.*

*Court's Ruling:*

The defendant failed to introduce any evidence in support of a proposition that the decision of T.C. Gasper to approve the transfer of monies from the Long Fund or core fund under the management of Mark Lay to the ADF violated OBWC investment policies. The Court is uncertain as to what counsel for the defendant is suggesting by saying that the Court prevented the defendant from establishing that OBWC employees committed crimes. To the contrary, T.C. Gasper and James McLean were cross-examined about their convictions for criminal conduct while employed by the OBWC. The fourth argument in support of a new trial is without merit and is DENIED.

5. *Refusal to admit minutes of the August 14, 2004 meeting of the OBWC oversight committee where Mr. McLean stated the OBWC had no hedge fund investments.*

*Court's Ruling:*

The Court has no obligation to search the record in the absence of specific di-

---

**66.** Specifically, the government contended that the "jury should hear neither evidence nor argument that OBWC may have acted negligently in monitoring the ADF and detecting the defendant's over-leveraging of the ADF". See Docket No. 29, page 10.

**67.** The defendant's response stated "Defendant does not believe that OBWC officers

were negligent." It is his position that they understood what was occurring and approved it. That evidence is surely admissible, but it also means that the defendant has no objection to granting of the motion requested by the government regarding negligent conduct. See Docket No. 30, pages 2–3.

rection from the party claiming error on the part of the Court that would justify granting a new trial. The defendant's objection that the Court refused to admit the minutes of the August 14, 2004 meeting of the OBWC oversight committee is not identified in the defendant's motion. Counsel for the government has directed the Court's attention to Docket No. 101, page 213, to the re-cross examination of McLean where the following question was asked to which an objection was made and sustained by the Court. Specifically, the question stated "Now, focusing on the time you were seeking these reports, July, August of 2004 and the months thereafter, isn't it a fact that you informed the oversight commission that the Bureau was even invested in the hedge fund?"

The Court notes there is nothing in that question by counsel for the defendant which requested the Court to admit the minutes of the August 14, 2004 meeting of the OBWC oversight committee.

The Court finds that the fifth basis asserted by the defendant in support of his motion for new trial lacks merit.

6. *Refusal to admit the 2004 version of the OBWC investment policies and guidelines authorizing hedge fund investments for the first time.*

*Court's Ruling:*

The defendant's motion for new trial with respect to objection number six is insufficient on its face to justify consideration by the Court. The claim in support of a motion for a new trial is DENIED.

7. *Upon reading Mark Lay's civil deposition testimony to the jury after deliberations began, refusal to give limiting instructions required by* United States v. Marvin Smith, *419 F.3d 521 (6th Cir.2005) cautioning the jury not to place too much emphasis on the testimony or take it out of context.*

*Court's Ruling:*

During the government's case in chief, it presented deposition testimony of Mark Lay taken in a civil case brought by the State of Ohio against Mark Lay in Ohio's effort to recoup the losses of the OBWC. The deposition testimony included statements by Mark Lay indicating that the OBWC was his client with respect to the OBWC's investment in the ADF, the hedge fund.[68] By the time of the criminal trial, Mark Lay, through his counsel had changed his position. As a consequence, the government's request that the deposition testimony be presented to the jury was granted. The challenged issue of the status of the OBWC as a client in connection with the ADF, in the Court's view, made the deposition testimony of Mark Lay relevant.

After the jury began its deliberations, it requested the opportunity to hear again the deposition testimony of the defendant. The note from the jury foreman during the jury deliberations stated: "Can we see the Grand Jury testimony of Mark Lay?" The Court then stated that it understood the jury to be asking for the deposition testi-

---

**68.** The deposition in question was taken in Pennsylvania. The court reporter who took Mark Lay's deposition in the civil case, Sophia M. Smith, appeared as a government witness and testified as to what her notes regarding the testimony of Mark Lay indicated. Before her testimony commenced, it was agreed that her testimony would be limited to specific questions and answers set forth in the Mark Lay deposition. The testimony of Sophia Smith respecting the specific questions and answers in the Mark Lay deposition appear at pp. 147–170 in the transcript of the proceedings before the Court on October 24, 2007. (Docket No. 120)

mony of the defendant. Specifically, the Court stated "After considering the objections of counsel, the Court permitted the previous deposition testimony to be read to the jury. Specifically, Richard DelMonico, the court reporter who had transcribed the deposition testimony during the trial, testified as to what his notes stated. Out of an abundance of caution, the Court had a second court reporter, Lori Callahan, record the testimony of Richard DelMonico who was the reporter when the Lay deposition was read during the trial."

The transcript of that proceeding demonstrates that the Court instructed the jury before it allowed the testimony to be re-read to the jury and stated:

> "Members of the jury, you requested to hear the testimony of the court reporter who gave testimony of the defendant and I have decided to permit you to hear that. However, I advise you that you are not to accord undue influence to that testimony." [69]

The substance of the seventh claim advanced in support of the motion for a new trial is that the Court refused to give limiting instructions as required in *United States v. Smith* 419 F.3d 521 (6th Cir. 2005). The Court is of the view that its preliminary instruction prior to the re-reading of the Lay deposition during the jury deliberations did not offend *United States v. Smith*. The Court finds that the seventh claim advanced in support of the motion for a new trial is without merit.

8. *Failure to rule on objections in Mark Lay's deposition prior to reading it to the jury.*

*Court's Ruling:*

The defendant's motion fails to direct the Court where he had requested the Court to rule on the objections in Mark

Lay's deposition testimony prior to reading it to the jury. The eighth claim in support of the motion for a new trial is without merit.

9. *Failure to advise the jury as a matter of law that the PPM guidelines were revised on May 18, 2004.*

*Court's Ruling:*

The Court agrees with the government that the determination of whether the PPM guidelines had been revised was a fact issue left appropriately for the jury. The ninth claim in support of a motion for a new trial is without merit.

9a. *The defendant's cumulative error claim.*

Finally, counsel for the defendant, in its brief statement of claims in support of its motion for a new trial, concluded with the following language:

> " "Errors that might not be so prejudice [sic] as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." *Walker v. Engle*, 703 F.2d 959, 963 (6th Cir.1983). *United States v. Meckey*, 2007 U.S.App. Lexis (6th Cir.2007). That is the case here.
>
> The errors outlined above cumulatively produced a setting that was fundamentally unfair to Mark Lay.
>
> A new trial is respectfully requested."

*Court's Ruling:*

As the Court has found without merit any of the nine claims supporting the defendant's motion for a new trial, there is no basis to consider whether the cumula-

---

69. See transcript for October 30, 2007, Docket No. 151 at p. 5.

tive errors justified, as claimed by the defendant, a basis for a new trial.

In sum, the Court finds the defendant's motion for a new trial to be without merit and it is overruled.

### VIII. Conclusion

For the reasons set forth in this Memorandum Opinion, the defendant's motion for an acquittal is DENIED. The defendant's motion for a new trial is DENIED.

The Court will proceed with the sentencing of the defendant as previously scheduled.

IT IS SO ORDERED.

APPENDIX 1

IN THE UNITED STATES
DISTRICT COURT

FOR THE NORTHERN DISTRICT
OF OHIO

EASTERN DIVISION

UNITED STATES OF AMERICA, Plaintiff,

v.

MARK D. LAY, Defendant.

### SUPERSEDING INDICTMENT

CASE NO. 1:07CR339

Title 15, United States Code, §§ 80b–6 & 80b–17 (Investment Adviser Fraud);

Title 18, United States Code, Section–1341 (Mail Fraud);

Title 18, United States Code, Section 1349 (Conspiracy to Commit or Attempt Fraud)

Title 18, United States Code, Section 2 (Aiding and Abetting).

DOWD, District Judge.

The Grand Jury charges:

GENERAL ALLEGATIONS

At all times material to this Indictment:

**The Investor**

1. The Ohio Bureau of Workers' Compensation (hereinafter "OBWC") is an Ohio agency, organized and existing under the laws of the State of Ohio.

2. Beginning in or about 1955, the OBWC began assisting Ohio-based employers and employees to cover expenses related to workplace injuries by providing medical and compensation benefits for work-related injuries, diseases and deaths. Although its main office is located in Columbus, Ohio, the OBWC has 16 customer service offices located across the state of Ohio, including in the Northern District of Ohio. At all times relevant to the offenses charged in the Indictment, the OBWC had assets which averaged approximately 19 billion dollars and was one of the largest exclusive state-fund workers' compensation bureaus in the United States. The assets of the OBWC were under the management and control of the Chief Financial Officer and the employees of the Investment Department. The overall operation of the OBWC involved and affected interstate commerce as did the management and execution of matters regarding its financial investments.

**The Defendant MARK D. LAY**

3. MARK D. LAY (hereinafter "LAY"), during all relevant times, was Chairman, Co–CEO, principal shareholder and Chief Investment Strategist of MDL Capital Management, Inc. (hereinafter "MDL").

4. LAY founded MDL in 1992 and incorporated it under the laws of the State of Pennsylvania.

5. MDL was, at all relevant times, registered with the Securities and Exchange Commission (hereinafter "SEC") as an investment adviser under the Investment

Advisers Act of 1940 ("the Act"). As an investment adviser, MDL provided investment adviser services, including but not limited to the purchase and selling of securities, to corporate, institutional and individual investors for compensation. The Act is codified in Title 15 of the United States Code.

6. Title 15, United States Code Section 80b–2(11) defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."

### LAY'S Fiduciary Duty as an Investment Adviser to the OBWC

7. SEC-registered investment advisers and their officers and directors have fiduciary obligations of good faith, loyalty, and fair dealing to the clients who entrust their money to the investment advisers.

8. As a registered investment adviser and fiduciary, MDL and its respective officers and employees, including LAY, were required at all times: (a) to act in good faith and in the best interests of its client, the OBWC; (b) to make full and fair disclosure of all material facts bearing on the investment adviser relationship between MDL and its client, the OBWC; and (c) to employ reasonable care to avoid misleading its client, the OBWC.

### Initial Relationship Between MDL Capital and the OBWC and The Long Fund

9. On or about May 14, 1998, the OBWC and MDL entered into an Investment Management Agreement ("Management Agreement"), signed by LAY on behalf of MDL and by the then Adminis-

trator of the OBWC, whereby OBWC hired MDL as a fixed income investment manager.

10. The Management Agreement established MDL as an "investment adviser" as defined by the Investment Advisers Act of 1940.

11. The Management Agreement required MDL to "use its best professional judgment to manage and invest" the OBWC's money and required MDL to "agree[ ] to adhere to the standard of care and conduct required of a fiduciary under [Ohio Revised Code] Chapter 4123 and any applicable federal and state law." At all relevant times, Ohio Revised Code Section 4123.44 stated that "fiduciaries shall discharge their duties with respect to the funds with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and by diversifying the investments of the assets of the funds so as to minimize the risk of large losses, unless under the circumstances it is clearly not prudent to do so."

12. Schedule A to the Management Agreement specifies that "[t]he Investment Manager accepts full fiduciary responsibility for the Bureau's assets under its management under the Ohio Revised Code and any applicable federal and state law."

13. Pursuant to the relationship established by the Management Agreement, from on or about May 1998 until in or about July 2003, the OBWC allocated a total of $355 million to the management of MDL to be managed in a fund, hereinafter called the Long Fund.

14. The 1998 Management Agreement required that OBWC pay MDL a quarter-

ly management fee. From on or about 1998 through on or about April 28, 2005, the OBWC paid MDL approximately $1,973,797 in management fees for the Long Fund.

### The MDL Active Duration Fund. Ltd. ("ADF")

15. On May 2, 2002, the MDL Active Duration Fund, Ltd. (hereinafter "ADF") was incorporated by LAY in Bermuda as an investment vehicle through which United States tax exempt investors and non-United States resident investors could invest in a portfolio consisting primarily of government, corporate and mortgage-backed fixed income securities. MDL exercised general management and investment authority over the ADF.

16. On July 2, 2002, Bye–Laws governing the ADF were established. The Bye–Laws gave the ADF Board general management and investment authority over the ADF and provided that the ADF would be governed by a Board of Directors.

17. LAY, along with MDL's President and others known to the Grand Jury, were appointed members of the ADF Board of Directors.

18. A Bermuda-based company was named as the Administrator of the ADF.

19. On November 18, 2002, MDL entered into an Investment Advisory Agreement (hereinafter Advisory Agreement), whereby MDL was selected to be ADF's Investment Adviser.

20. Pursuant to the Advisory Agreement, the ADF delegated general authority to MDL to manage the investment of the assets allocated to the ADF and to administer the ADF's business and administrative operations, subject to the direction of the ADF's Board of Directors.

21. a. The Advisory Agreement referred to the ADF's Confidential Private Placement Memorandum (hereinafter "PPM"), as more fully describing the investment vehicle.

b. The PPM provided, among other things, that, as the ADF's Investment Adviser, LAY and others specified in the PPM would "have direct and primary responsibility for all investment decisions of the fund."

c. The PPM also provided employment credentials for LAY that stated "[f]rom 1984 to 1989, Mr. Lay was with Citicorp Investment Bank" and, thereby, falsely extended LAY's time of employment with Citicorp and omitted LAY's employment with Mellon which occurred from approximately June 1988 to approximately August 1988 and Pittsburgh National Bank ("PNC") which occurred from approximately September 1988 to approximately August 1989, in an effort to conceal LAY's past employment with Mellon and PNC and the reasons for his separation from Mellon and PNC from the OBWC and others to whom LAY marketed the ADF.

d. Among other things, the PPM required that investor clients pay MDL both a Management Fee and an Incentive Fee. During the short life of the ADF, the sole investor client, OBWC, paid MDL approximately $1,793,231 in such fees. The $1,793,231 is in addition to the management fee paid for the MDL's management of the Long Fund referenced in paragraph 14 above, for a total of approximately $3,767,028.

22. LAY and the then principal (known to the Grand Jury) of a brokerage firm located in Westlake, Ohio (hereinafter Marketer 1), each solicited the OBWC to invest in the ADF. LAY and Marketer 1 provided the OBWC with a PPM one of which bore the notation: "Copy No. 2 Issued to Great Lakes Capital Partners" and

the statement "THE DATE OF THIS MEMORANDUM IS JANUARY 15, 2003", which outlined the terms and conditions of the ADF. The PPM provided that "up to 150% of the Fund's assets, at the time of investment, may be leveraged (i.e., the combined value of borrowings and short positions)." This limitation on the utilization of leverage applied to all ADF assets, including but not limited to United States Treasury Securities. The PPM cautioned that while leverage may "enhance returns", it may also "substantially increase the risk of loss."

23. On August 20, 2003, OBWC agreed to invest $100 million in the ADF. On September 12, 2003, the OBWC transferred $100 million via electronic funds transfer from the Long Fund to the ADF as the initial investment.

24. Despite efforts by LAY and others to market the ADF to other potential investors, the OBWC was, during all relevant times, the sole investor in the ADF.

*LAY Directed Transactions for the ADF*

25. During all relevant times, LAY directed the trade activity regarding the United States Treasury Securities in the ADF portfolio.

26. During all relevant times, LAY utilized leverage well in excess of 150% of the ADF''s assets in contravention of the terms of the January 15, 2003 PPM and in contravention of his fiduciary role as an investment adviser to act in the best interest of his client, the OBWC.

27. In directing and conducting transactions on behalf of the ADF, LAY relied upon the services of several brokerage businesses located in the Northern District of Ohio and elsewhere.

28. In the Northern District of Ohio, LAY used the brokerage services of the Westlake firm controlled by Marketer 1, which benefitted financially from ADF transactions.

29. Outside of Ohio, in the state of New York, LAY relied on several different entities to act as the prime broker and to execute trade activity.

30. LAY, others at MDL acting at the direction of LAY, and those at the various brokerage firms relied upon by LAY to trade securities for the ADF communicated via telephone, email and mail services, including the U.S. Mail and commercial carrier service.

31. LAY, others at MDL and other sources provided the OBWC with monthly and other intermittent reports on the ADF. None of these reports showed the amount of leverage exercised in the ADF.

32. After becoming concerned about a $7 million decline in the value of the ADF, the chief investment officer ("CIO") of the OBWC met LAY in or about mid-April 2004 to discuss the loss. During that meeting, LAY did not state or admit that he had exercised leverage of approximately 900%, well in excess of the 150% limitation.

33. In mid-May 2004, the CIO of OBWC received the April 2004 month-end report on the ADF and learned for the first time that the ADF had lost $32 million, something that LAY concealed during the mid-April meeting with the CIO.

34. At no time did LAY reveal to OBWC that the losses were magnified or caused by overleveraging, even though LAY then well knew that he routinely had exceeded the 150% limit in the PPM.

35. In or about late Spring 2004, the ADF began suffering significant losses because LAY exercised leverage above the 150% limit set in the PPM. During this time, LAY continued to conceal and misrepresent to OBWC the true nature of the leverage.

36. Despite the great loss of ADF's value and due to LAY's failure to disclose his use of leverage in excess of 150%, on May 21, 2004, the OBWC invested an additional $100 million in the ADF. This second $100 million investment was also transferred from the Long Fund to the ADF.

37. On or about May 18, 2004, after confronting LAY about the excessive leveraging being utilized in the ADF, the ADF Board of Directors decided to (a) revise the language of the PPM to allow leverage in excess of 150% regarding United States Treasury securities only; (b) to notify the OBWC that LAY had exercised leverage in excess of 150% in the ADF; and (c) to seek the OBWC's approval of LAY's continued exercise of leverage in excess of 150%.

38. On August 11, 2004, the ADF Board issued a letter to the OBWC entitled "Recent Changes to MDL Active Duration Fund, Ltd." (hereinafter Proposed Revisions Letter), purporting to notify the OBWC of LAY's past and intended use of leverage in excess of 150%. The Board of Directors requested that a representative of the OBWC sign the letter in acknowledgment of its receipt and in agreement with the change in the use of leverage.

39. The OBWC refused to permit LAY to exercise leverage in excess of 150% and, therefore, refused to execute the letter or agree to the changes to the PPM.

40. On or about September 16, 2004, the Chief Financial Officer ("CFO") and the CIO of the OBWC confronted LAY about the poor performance of the ADF, which by this time had a value of approximately $57 million dollars, despite the $200 million invested. During that meeting, LAY admitted having overleveraged the ADF, but even then falsely told OBWC that MDL had only leveraged approximately 900% of the ADF assets, when he then knew and should have known that leveraging exceeded 4500%.

41. By the time the OBWC discovered that the losses and decline in value of the ADF were largely due to LAY's exercise of leverage in violation of the PPM, the OBWC's investment of $200 million had been substantially lost.

42. On or about September 23, 2004, in order to avoid the imminent loss of all of its remaining investment in the ADF, at LAY's request, the OBWC invested an additional $25 million into the ADF, making the total invested in the ADF $225 million.

43. On September 29, 2004, the OBWC formally requested a redemption of its investment in the ADF by submitting a redemption notice to the ADF's administrator and requesting that the remaining balance of the OBWC's investment be liquidated and distributed to the OBWC by the end of 2004.

44. In October 2004, LAY contacted the OBWC by telephone and in person in Columbus, Ohio in an attempt to obtain further investments to enable the ADF to cover its margin calls due to LAY's excessive leveraging. The OBWC declined to invest further assets into the ADF.

45. As a result of LAY engaging in fraud and deceit upon the OBWC by using leverage well in excess of 150% and not informing the OBWC or gaining its consent to the overleveraging, the ADF and, ultimately, the OBWC suffered a large financial loss.

46. As of November 3, 2004, the OBWC was able to recover only approximately $9 million of its $225 million investment.

The Grand Jury further charges:

## COUNT 1

### (Investment Adviser Fraud: 15 U.S.C. §§ 80b–6 & 80b–17)

1. The allegations in paragraphs 1 through 46 of the General Allegations are realleged and incorporated by reference as though fully set forth herein.

2. As investment advisers registered with the SEC under the Investment Advisers Act of 1940, MDL its officers and employees, including LAY, owed fiduciary obligations of good faith, loyalty, and fair dealing to its client, the OBWC, which entrusted the OBWC's money to MDL's management. As a fiduciary, MDL and its respective officers and employees were required at all times to: (a) act in good faith and in the best interests of its client, the OBWC; (b) make full and fair disclosure of all material facts bearing on the investment advisory relationship between MDL and its respective client, the OBWC; and (c) employ reasonable care to avoid misleading its client, the OBWC.

3. In or about September 2003 through January 2005, in the Northern and Southern Districts of Ohio and elsewhere, the defendant MARK D. LAY, together with others known and unknown to the Grand Jury, including brokers and brokerages located in the Northern District of Ohio and elsewhere, unlawfully, willfully and knowingly did use and cause to be used the mails, wires and other means and instrumentalities of interstate and foreign commerce, directly and indirectly, to: (a) employ devices, schemes, and artifices to defraud, the client, the OBWC and thereby the ADF; (b) engage in transactions, practices and courses of business which operated as a fraud and deceit upon, the client, the OBWC and thereby the ADF; and (c) engage in any act, practice and course of business which

was fraudulent, deceptive and manipulative, to wit: exercising leverage in excess of 150% in the ADF, in violation of the PPM, and concealing and failing to disclose to the full extent his exercise of leverage in excess of 150%.

All in violation of Title 15, United States Code, Sections 80b–6 and 80b–17.

The Grand Jury further charges:

## COUNT 2

### (Conspiracy to Commit or Attempt Mail and Wire Fraud, 18 U.S.C. §§ 1341 & 1343; 18 U.S.C. § 1349)

1. The allegations contained in paragraphs 1–46 of the General Allegations and paragraphs 1–2 of Count 1 of this Indictment are realleged and incorporated by reference in this Count.

2. From in or about September 2003 and continuing through in or about January 2005, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio and elsewhere, the defendant MARK D. LAY did knowingly and willfully combine, conspire, confederate and agree with others known and unknown to the Grand Jury to commit offenses against the United States, namely:

 a. to commit mail fraud, in violation of Title 18, United States Code, Section, 1341; and

 b. to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

### The Conspiracy Scheme

3. From in or about September 2003 and continuing through in or about January 2005, the exact dates being unknown to the Grand Jury, in the Northern District of Ohio and elsewhere, MARK D. LAY defendant herein, and others known and unknown to the Grand Jury, including

other employees of MDL, other directors of the ADF and brokers assisting in or benefitting from trade activity regarding United States Treasury Securities in the ADF, having combined, conspired, confederated and agreed with each other and with others known and unknown to the Grand Jury to devise and intend to devise a scheme and artifice to defraud the OBWC as to a material matter and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, (1) caused matters and things to be placed in any post office and authorized depository to be sent and delivered by the Postal Service, (2) caused matters to be delivered by commercial interstate carrier according to the direction thereon, and (3) caused writings, signals and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice, as set forth in paragraphs 4–7 below.

### Object of the Conspiracy Scheme

4. It was a purpose and object of the scheme that MARK D. LAY and other employees of MDL, other directors of the ADF and brokers assisting in or benefitting from trade activity regarding United States Treasury Securities in the ADF would defraud, deceive, and manipulate the OBWC regarding the ADF, including the amount of leverage exercised, the impact of leverage on the ADF's value and the management team and administration of the ADF,

### Manner and Means

5. In furtherance of the scheme to defraud, LAY and others known and unknown to the grand jury caused false employment credentials to be included in the PPM. The credentials language on page 14 of the PPM falsely stated that LAY was employed by Citicorp Investment Bank "[f]rom 1984 to 1989" when Lay well knew that his employment at Citicorp ended in June of 1988. The false credentials omitted LAY's employment with Mellon from approximately June 1988 to approximately August 1988 and PNC from approximately September 1988 to approximately August 1989 in an effort to conceal LAY's past employment with Mellon and PNC and the reasons for his separation from Mellon and PNC from the OBWC and others who relied upon the PPM.

6. In furtherance of the scheme to defraud, LAY and others known and unknown to the grand jury caused documents and information to be delivered and transmitted interstate, including causing documents and information to be delivered into the Northern District of Ohio from outside the State of Ohio and to be sent from the Northern District of Ohio to locations outside the State of Ohio. These documents resulted in the execution of investment transactions that caused the ADF leverage to exceed 150%.

7. In furtherance of the scheme to defraud, LAY and others known and unknown to the Grand Jury concealed the true nature and effect of the use of leverage in excess of 150% by, among other means, failing to disclose the use of excess leverage and its effect on the OBWC investment funds to the OBWC and to others.

8. In furtherance of the scheme to defraud, LAY and others known and unknown to the Grand Jury made false statements to others regarding the OBWC's alleged knowledge of the excessive leveraging, OBWC's alleged consent to excessive leveraging, and OBWC's alleged commitment to make additional investments in the ADF.

*Mailings and Wire Communications*

9. In furtherance of the conspiracy, and to achieve its object, one or more of the co-conspirators committed and caused to be committed the following overt acts, among others.

10. On or about the dates set forth below, MARK D. LAY and others known and unknown to the Grand Jury executed and attempted to execute the scheme and artifice set forth above by causing and attempting to cause, in the Northern District of Ohio, Eastern Division, and elsewhere, the following matters and things to be mailed and delivered by commercial interstate carrier as set forth in each overt act below:

| Overt Act No. | Approximate Date of Mailing | Description of Mailing |
|---|---|---|
| 1 | February 27, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on February 27, 2004 by the MDL Active Duration Fund nailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 2 | March 3, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on March 3, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 3 | April 15, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on April 15, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
| 4 | May 1, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with a maturity date of February 15, 2031 sold on May 11, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
| 5 | May 27, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on May 27, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 6 | July 30, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on July 30, 2004 by the MDL Active Duration Fund nailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 7 | August 17,2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on August 17, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in |

| | | |
|---|---|---|
| | | New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 8 | August 26, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with a maturity date of February 15, 2031 sold on August 26, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
| 9 | September 16, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on September 16, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |
| 10 | September 17, 2004 | Trade Confirmation Statements concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on September 17, 2004 by the MDL Active Duration Fund mailed from Bonds Direct Securities LLC in New York, New York to MDL Capital Management in Pittsburgh, Pennsylvania. |

9. On or about the dates set forth below, MARK D. LAY and others known and unknown to the Grand Jury executed and attempted to execute the scheme and artifice set forth above by causing writings, signals and sounds to be transmitted by wire in interstate and foreign commerce as set forth below:

| Overt Act No. | Description of Wiring | Approximate Date of Wiring |
|---|---|---|
| 11 | Email communication from MARK LAY to broker in New York, N.Y. during which LAY directed the New York, N.Y. broker to pay commission to himself and LAY's Westlake, Ohio broker: "1/4 for you and greatlakes". | August 26, 2004 |
| 12 | Facsimile transmission from MARK LAY to prime brokerage firm in New York, N.Y. transmitting a two-page letter dated August 10, 2004 regarding "Recent Changes to MDL Active Duration Fund, Ltd. (The Fund)." | August 27, 2004 |

All in violation of Title 18, United States Code, Section 1349.

The Grand Jury further charges:

### COUNTS 3–4

(Mail Fraud: 18 U.S.C. §§ 1341 and 2)

1. Paragraphs 1 through 46 of the General Allegations of this Indictment and paragraphs 1–2 of Count 1 are incorporated by reference herein.

2. From in or about September 2003 until in or about January 2005, the exact dates being unknown to the grand jury, in the Northern District of Ohio and elsewhere, defendant MARK D. LAY, having devised and intended to devise a scheme and artifice to defraud the OBWC as to a

material matter, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, (1) caused matters and things to be placed in any post office and authorized depository to be sent and delivered by the Postal Service and (2) caused matters to be delivered by commercial interstate carrier according to the direction thereon, for the purpose of executing and attempting to execute the scheme and artifice as set forth in Counts 3 and 4 below.

*Mailings*

3. On or about the dates set forth below, MARK D. LAY and others known and unknown to the Grand Jury executed and attempted to execute the scheme and artifice set forth above by causing and attempted to cause, in the Northern District of Ohio, Eastern Division, and elsewhere, the following matters and things to be mailed and delivered by commercial interstate carrier as set forth in each Count below:

| COUNT | APPROXIMATE DATE OF MAILING | DESCRIPTION OF MAILING |
|---|---|---|
| 3 | April 15, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on April 15, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd. in Westlake, Ohio. |
| 4 | May 11, 2004 | Trade Confirmation concerning the sell of United States Treasury Bonds with maturity date of February 15, 2031 sold on May 11, 2004 by the MDL Active Duration Fund mailed from a Pershing LLC office in Secaucus, New Jersey to the office of Great Lakes Capital Partners Ltd in Westlake, Ohio. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

The Grand Jury further charges:

## FORFEITURE

The allegations of Counts 3 and 4 are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), 982 and 28 U.S.C. § 2461(c). As a result of the foregoing offenses, defendant, MARK D. LAY, shall forfeit to the United States any and all property, real and personal, that constitutes, or is derived from, proceeds obtained, directly or indirectly, or traceable to said violations; including, but not limited to, the following: A money judgment in the amount of $1,793,231.00.

## SUBSTITUTE PROPERTY

In the event that any property subject to forfeiture under 18 U.S.C. §§ 981(a)(1)(C), 982 and 28 U.S.C. § 2461(c), as a result of any act or omission of the defendant:

1. cannot be located upon exercise of due diligence;

2. has been transferred or sold to, or deposited with a third party;

3. has been placed beyond the jurisdiction of this Court;

4. has been substantially diminished in value; or,

5. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) [as incorporated by 18 U.S.C. § 982(b)], to seek forfeiture of any other property of the defendant, up to an amount equivalent to the value of the property forfeitable under 18 U.S.C. §§ 981(a)(1)(C), 982 and 28 U.S.C. § 2461(c).

A TRUE BILL

Original document—Signatures on file with the Clerk of Courts, pursuant to the E–Government Act of 2002.

Sept. 7, 2007.

APPENDIX 2

## Percentage of Trading Days by Leverage Range

| % of Trading Days | Leverage Range | |
|---|---|---|
| 37.9% | 0% | - 150% |
| 15.3% | 151% | - 300% |
| 13.2% | 301% | - 500% |
| 9.4% | 501% | - 1000% |
| 7.7% | 1001% | - 2000% |
| 6.8% | 2001% | - 4000% |
| 2.1% | 4001% | - 6000% |
| .4% | 6001% | - 8000% |
| 3.8% | 8001% | - 10000% |
| 3.4% | 10001% | - 14000% |

Highest Leverage Percentage 12808%

GOVERNMENT EXHIBIT 3011 1:07CR539

## APPENDIX 3

### INSTRUCTION 13

**Investment Advisers' Fraud,
15 U.S.C. §§ 80b-6**

**The Nature of the Offense
Charged in Count 1**

Specifically, Count 1 alleges:

1. The allegations in paragraphs 1–46 of the general allegations are realleged and incorporated by reference as though fully set forth herein.

2. As investment advisers registered with the SEC under the Investment Advisers Act of 1940, MDL its officers and employees, including LAY, owed fiduciary obligations of good faith, loyalty, and fair dealing to its client, the OBWC, which entrusted the OBWC's money to MDL's management. As a fiduciary, MDL and its respective officers and employees were required at all times to: (a) act in good faith and in the best interests of its client, the OBWC; (b) make full and fair disclosure of all material facts bearing on the investment advisery relationship between MDL and its respective client, the OBWC; and (c) employ reasonable care to avoid misleading its client, the OBWC.

3. In or about September 2003 through January 2005, in the Northern and Southern Districts of Ohio and elsewhere, the defendant MARK D. LAY, together with others known and unknown to the Grand Jury, including brokers and brokerages located in the Northern District of Ohio and elsewhere, unlawfully, willfully and knowingly did use and cause to be used the mails, wires and other means and instrumentalities of interstate and foreign commerce, directly and indirectly, to:(a) employ devices, schemes, and artifices to defraud, the client, the OBWC and thereby the ADF; (b) engage in transactions, practices and courses of business which operated as a fraud and deceit upon, the client, the OBWC and thereby the ADF; and (c) engage in any act, practice and course of business which was fraudulent, deceptive and manipulative, to wit: exercising leverage in excess of 150% in ADF, in violation of the PPM, and concealing and failing to disclose to the full extent his exercise of leverage in excess of 150%.

All in violation of Title 15, United States Code, Sections 80b-6.

### INSTRUCTION 14

**Investment Advisers' Fraud,
15 U.S.C. § 80b-6**

**The Statute Defining the Offense
Charged in Count 1**

15 U.S.C. 80b-6 of the United States Code provides that:

"It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud any client or prospective client;

(2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

.........

(4) to engage in any act, practice or course of business which is fraudulent, deceptive, or manipulative ...."

### INSTRUCTION 15

**Investment Advisers Fraud**

**15 U.S.C. § 80b-6(1), (2) or (4)—
Essential Elements**

There are three sections to 15 U.S.C. 80b-6 that the government alleges the de-

fendant, in connection with Count 1, violated: 80b–6(*l*), 80b–6(2), and 80b–6(4). In order to find the defendant guilty of committing investment adviser fraud under the Investment Adviser Act, the government must prove beyond a reasonable doubt *each* element of *either* 80b–6(*l*) *or* 80b–6(2) *or* 80b–6(4).

In your deliberations, you should go through each element of 80b–6(1), 80b–6(2), and 80b–6(4), separately. If any element of any one of these sections of investment adviser fraud is not proven by the government beyond a reasonable doubt, then the government has not met its burden of proof of investment adviser fraud with respect to that section. So for example, if you unanimously determine that the government did not prove beyond a reasonable doubt each element of 80b–6(*l*), then the defendant is not guilty of the crime of investor fraud under the provisions of 80b–6(1), and you should then move on to consider the elements of 80b–6(2), and so on. If at any time you unanimously agree that the government has proven beyond a reasonable doubt each element of investment adviser fraud for any one of these three sections, then you do not need to further consider the remaining investment adviser fraud sections. So for example, if you unanimously determine that the government has proved beyond a reasonable doubt each element of 80b–6(1), then you do not need to further consider the elements of 80b–6(2) or 80b–6(4).

If you find that all of the elements are met in any one of the sections, then your verdict will be guilty with respect to Count 1. On the other hand, if you do not find that all of the elements are met for any of the sections, then your verdict will be not guilty with respect to Count 1.

## INSTRUCTION 16

### Investment Advisers Fraud

### 15 U.S.C. § 80b–6(1)

In order to convict the defendant of the crime of violating 15 U.S.C. 80b–6(*l*), as charged in Count 1 of the Superseding Indictment, the government must prove each of the following elements beyond a reasonable doubt:

*Element One:* That Mark Lay, or Mark Lay acting on behalf of MDL Capital Management, was an investment adviser.

*Explanation:* I will instruct you regarding Element One in Instruction 19.

*Element Two:* That the Ohio Bureau of Workers' Compensation was Mark Lay's client with respect to the OBWC's investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Two at Instruction 20.

*Element Three:* That Mark Lay directly or indirectly employed a device, scheme, or artifice to defraud the OBWC in connection with its investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Three at Instruction 22.

*Element Four:* That Mark Lay knowingly, willfully and with the specific intent to defraud, devised or participated in a device, scheme or artifice to defraud the OBWC in connection with its investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Four at Instruction 25.

*Element Five:* That Mark Lay employed such device, scheme or artifice to defraud by use of the mails or other instrumentality of interstate commerce.

*Explanation:* I will instruct you regarding Element Five at Instruction 26.

## INSTRUCTION 17

### Investment Advisers Fraud

#### 15 U.S.C. § 80b–6(2)

In order to convict a defendant of the crime of violating 15 U.S.C. 80b–6(2), as charged in Count 1 of the Superseding Indictment, the government must prove each of the following elements beyond a reasonable doubt:

*Element One:* That Mark Lay, or Mark Lay acting on behalf of MDL Capital Management, was an investment adviser.

*Explanation:* I will instruct you regarding Element One at Instruction 19.

*Element Two:* That the Ohio Bureau of Workers' Compensation was Mark Lay's client with respect to the OBWC's investment in the MDL Active Duration Fund;

*Explanation:* I will instruct you regarding Element Two at Instruction 20.

*Element Three:* That Mark Lay directly or indirectly engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon the OBWC in connection with its investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Three at Instruction 23.

*Element Four:* That Mark Lay knowingly and willfully engaged in a transaction, practice or course of business with the specific intent to defraud or deceive the OBWC in connection with its investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Four at Instruction 25.

*Element Five:* That Mark Lay engaged in such transaction, practice or course of business to defraud or deceive by use of the mails or other instrumentality of interstate commerce.

*Explanation:* I will instruct you regarding Element Five at Instruction 26.

## INSTRUCTION 18

### Investment Advisers Fraud

#### 15 U.S.C. § 80b–6(4)

In order to convict a defendant of the crime of violating 15 U.S.C. 80b–6(4), as charged in Count 1 of the Superseding Indictment, the government must prove each of the following elements beyond a reasonable doubt:

*Element One:* That Mark Lay, or Mark Lay acting on behalf of MDL Capital Management, was an investment adviser.

*Explanation:* I will instruct you regarding Element One at Instruction 19.

*Element Two:* That Mark Lay directly or indirectly engaged in an act, practice, or course of business which was fraudulent, deceptive or manipulative in connection with the OBWC's investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Two at Instruction 24.

*Element Three:* That Mark Lay knowingly and willfully engaged in such act, practice, or course of business with the specific intent to defraud, deceive, or manipulate the OBWC with respect to its investment in the MDL Active Duration Fund.

*Explanation:* I will instruct you regarding Element Three at Instruction 25.

*Element Four:* That Mark Lay engaged in such practice, act or course of business by use of the mails or other instrumentality of interstate commerce.

*Explanation:* I will instruct you regarding Element Four at Instruction 26.

## INSTRUCTION 19

### Investment Adviser Fraud, 15 U.S.C. § 80b–6

#### Who is an Investment Adviser

In order to satisfy the first element of all three sections of the Investment Advisers' Act violation as charged in Count 1, the government must prove beyond a reasonable doubt that Mark Lay, or Mark Lay acting on behalf of MDL Capital Management, was an investment adviser.

The Investment Adviser's Act at 15 U.S.C. § 80b–2(1 1) defines an investment adviser as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities...."

## INSTRUCTION 20

### Investment Advisers' Fraud, 15 U.S.C. § 80b–6

#### Who is a Client

In order to satisfy the second element of sections 80b–6($l$) and 80b–6(2) of the Investment Advisers' Act violation as charged in Count 1, the government must prove beyond a reasonable doubt that the Ohio Bureau of Worker's Compensation was Mark Lay's client with respect to its investment in the MDL Active Duration Fund. The government need not establish that the Ohio Bureau of Worker's Compensation was Mark Lay's client with respect to its investment in the MDL Active Duration Fund in order to prove the elements of section 80b–6(4) of the Investment Advisers' Act violation as charged in Count 1.

The Investment Advisers' Act does not provide a definition for "client." However, as discussed above, it does define "investment adviser," and an understanding of who is an investment adviser's client can be inferred from that definition as follows:

A client is an individual or entity which compensates an investment adviser to provide advice directly or through publications or writings about the value of securities or the advisability of investing in, purchasing, or selling securities.

It is the defendant's position that he had two separate relationships with the OBWC. With respect to the Long Fund, Mark Lay was the investment adviser to the OBWC, and the OBWC was his client. With respect to the MDL Active Duration Fund, the defendant contends that he was the investment adviser to the MDL Active Duration Fund itself, and had no investment adviser relationship with the OBWC—that is, the OBWC was not his client with respect to the OBWC's investment in the MDL Active Duration Fund.

It is the government's position in this case that the defendant Mark Lay had an investment adviser-client relationship with the Ohio Bureau of Workers' Compensation with respect to the OBWC's investment in the MDL Active Duration Fund.

It is for you to determine as a matter of fact whether Mark Lay had an investment adviser-client relationship with the OBWC with respect to its investment in the MDL Active Duration Fund. There are two possible outcomes of your determination on this issue.

First, you could find that the government failed to prove beyond a reasonable doubt that Mark Lay had an investment adviser-client relationship with the OBWC with respect to its investment in the MDL Active Duration Fund.

Second, you could find that the government proved beyond a reasonable doubt that Mark Lay did have an investment

adviser-client relationship with the OBWC with respect to the OBWC's investment in the MDL Active Duration Fund. You could make this finding in one of two ways. The Defendant does not dispute that he was the investment adviser and the OBWC was his client with respect to the Long Fund which continued throughout the period of time at issue in the Superseding Indictment. Therefore, you could find that: 1) Lay established a second investment adviser-client relationship with the OBWC and he was the investment adviser to the OBWC with respect to both the Long Fund and the MDL Active Duration Fund, or that 2) the investment adviser-relationship between Lay and the OBWC regarding the Long Fund was based on the investment of the monies in the Long Fund wherever it was invested and was not severed when Long Fund monies were invested in the MDL Active Duration Fund.

The determination of whether there was a investment adviser-client relationship between the defendant and the OBWC with respect to the OBWC's investment in the MDL Active Duration Fund is a question of fact that is up to you as a jury to decide. In order to make a determination regarding a question of fact, the government must have proved that fact beyond a reasonable doubt.

## INSTRUCTION 21

### Fiduciary Duty

The Superseding Indictment alleges that: a) the defendant Mark Lay had a fiduciary duty to the Ohio Bureau of Workers' Compensation, b) the defendant violated that fiduciary duty, and 3) violation of that fiduciary duty is a crime under 15 U.S.C. § 80b–6. A person has a fiduciary duty when the business he transacts, or the money or property which he han-

dles, is not his own or for his own benefit, but for the benefit of another person or entity. This relationship implies and necessitates a high degree of trust and confidence that the fiduciary will act for the benefit of the person or entity on whose behalf the fiduciary acts. This requires on the part of the fiduciary a duty of good faith, loyalty and fair dealing with respect to the person or entity on whose behalf the fiduciary acts. Generally, the Superseding Indictment charges the defendant exercised leverage in excess of 150% in the Active Duration Fund, that this exercise of leverage violated the PPM, that the defendant concealed and failed to disclose that leverage, and by so doing the defendant failed to act in the best interest of the OBWC and therefore violated his fiduciary duty to the OBWC.

**15 U.S.C. §§ 80b–6(*l*) and (2)**

If you find that the Ohio Bureau of Workers' Compensation was Mark Lay's client as an investment adviser with respect to the OBWC's investment in the MDL Active Duration Fund—that is you find that the government has proved beyond a reasonable doubt Element Two of Sections 80b–6(*l*) and 80b–6(2)—then Mark Lay had a fiduciary duty to the OBWC as a matter of law.

You should then go on to determine whether Mark Lay violated that fiduciary duty to the OBWC with respect to its investment in the MDL Active Duration Fund. If you determine that he violated his fiduciary duty, the violation of that duty is a factor for you to consider in determining whether the government has proved beyond a reasonable doubt Element Three of Section 80b–6(*l*) or Element Three of Section 80b–6(2). My instruction to you regarding Element Three of Sections 80b–6(*l*) and (2) follows at Instructions 22 and 23, respectively. A determination by you that Mark Lay violated his fiduciary duty

is only a factor for you to consider regarding Element Three of Sections 80b–6($l$) and (2), and does not automatically mean that the government has met its burden of proof with respect to those elements.

**15 U.S.C. § 80b–6(4)**

If you find that the Ohio Bureau of Workers' Compensation was not Mark Lay's client as an investment adviser with respect to the OBWC's investment in the MDL Active Duration Fund, then it is a question of fact for you the jury to determine whether the defendant had any fiduciary duty to the OBWC in connection with that investment which arose from his status as an investment adviser in connection with the Long Fund, and whether he violated that fiduciary duty. As I instructed you above, if you determine that the defendant violated his fiduciary duty, the violation of that duty is a factor for you to consider in determining whether the government has proved beyond a reasonable doubt Element Two of Section 80b–6(4). My instruction to you regarding Element Two of Section 80b–6(4) follows at Instruction 24. A determination by you that Mark Lay violated his fiduciary duty is only a factor for you to consider regarding Element Two of Section 80b–6(4), and does not automatically mean that the government has met its burden of proof with respect to that element.

## INSTRUCTION 22

### Investment Adviser Fraud, 15 U.S.C. § 80b–6(1)

### Existence of a Device, Scheme, or Artifice to Defraud Explained

In order to satisfy the third element of section 80b–6($l$) of the Investment Advisers' Act violation as charged in Count 1, the government must prove beyond a reasonable doubt that the Mark Lay participated in a scheme or artifice to defraud the Ohio Bureau of Workers Compensation in connection with its investment in the MDL Active Duration Fund.

(1) A "scheme or artifice" is merely a plan for the accomplishment of an object.

(2) A scheme or artifice to defraud is any plan, device, or course of action to obtain money or property by means of false or fraudulent pretenses, representations or promises reasonably calculated to deceive persons or average prudence. It is not defined according to a technical standard, but a standard that is a reflection of moral uprightness, fundamental honesty, fair play and right dealing. A "scheme or artifice to defraud" is limited only by man's ingenuity in devising new methods to defraud the community.

(3) "Fraud" is a general term which embraces all the various means by which human ingenuity can devise and which are resorted to by an individual to gain an advantage over another by false representation, suggestions or suppression of the truth, or deliberate disregard for the truth.

(4) Thus a "scheme to defraud" is merely a plan to deprive another of money or property by trick, deceit, deception or swindle.

(5) The scheme to defraud is alleged to have been carried out by making fraudulent statements and representations and failing to disclose information material to the investor, the OBWC.

(6) A statement, representation, claim or document is "false" if it is untrue when made and was then known to be untrue by the person making it or causing it to be made.

(7) A representation or pretense is "fraudulent" if it was falsely made or maintained with the intention to deceive.

(8) Deceitful statements or half truths or the concealment of material facts, and the expression of an opinion not honestly entertained may also constitute false or fraudulent statements or pretenses under the statute.

(9) The deception need not be premised upon spoken or written words alone. The arrangements of words, or the circumstances in which they are used may convey the false and deceptive appearance. If there is deception, the manner in which it is accomplished it immaterial

(10) The failure to disclose information may also constitute a fraudulent representation if the defendant was under a legal, professional or contractual duty to make such a disclosure, the defendant actually knew such a disclosure ought to be made and the defendant failed to make such a disclosure with the intent to defraud.

(11) The false or fraudulent misrepresentation must relate to a material fact or matter. A material fact is one which would reasonably be expected to be of concern to a reasonable and prudent person who is relying upon the representation or statement in making a decision

(12) This means if you find a particular statement of fact to be false, you must determine whether that statement was one that a reasonable person or investor might have considered important in making his or her decision. The same principle applies to half-truths or omissions of material fact.

(13) The government is not required to prove that the defendant himself originated the scheme to defraud. It is sufficient if you find that a scheme to defraud existed even if originated by another and that the defendant knowingly participated in it.

(14) In addition to proving the existence of a scheme to defraud, the government must prove that the alleged scheme contemplated depriving another of its money or property. Furthermore, it is not necessary that the government prove that the defendant actually realized any gain from the scheme, that the OBWC suffered any loss, that someone actually relied upon the misrepresentation or false statement or pretense or that the scheme actually succeeded in defrauding anyone. Although whether or not the scheme actually succeeded is really not the question, you may consider whether it succeeded in determining whether the scheme existed. It is enough if you find that a false statement or a statement omitting material facts was made as a part of a fraudulent scheme in the expectation that it would be relied on by the representatives of the OBWC.

(15) Finally, a scheme to defraud need not be shown by direct evidence, but may be established by all of the circumstances and facts in the case.

### INSTRUCTION 23

#### Investment Adviser Fraud—
#### 15 U.S.C. § 80b–6(2)

#### A Transaction, Practice, or Course of Business which Operates as a Fraud or Deceit

In order to satisfy the third element of section 80b–6(2) of the Investment Advisers' Act violation as charged in Count 1, the government must prove beyond a reasonable doubt that the Mark Lay directly or indirectly engaged in a transaction, practice or course of business which operated as a fraud or deceit upon the Ohio Bureau of Workers Compensation in connection with its investment in the MDL Active Duration Fund.

I have already instructed you as to what constitutes fraud and deceit in Instruction 21. This element is slightly different from Instruction 21 in that instead of proving a

scheme to defraud beyond a reasonable doubt, the government must prove beyond a reasonable doubt that the defendant engaged in a transaction, practice, or course of business which operated as a fraud and deceit. All of the same concepts of my Instructions to you in Instruction 21 apply, except that in this element, the fraud takes the form of a transaction or business practice rather than a scheme to defraud.

## INSTRUCTION 24

### Investment Adviser Fraud— 15 U.S.C. § 80b–6(4)

### An Act, Practice, or Course of Business which if Fraudulent, Deceptive or Manipulative

In order to satisfy the second element of section 80b–6(4) of the Investment Advisers' Act violation as charged in Count 1, the government must prove beyond a reasonable doubt that the Mark Lay directly or indirectly engaged in a transaction, practice or course of business which operated as a fraud or deceit upon the Ohio Bureau of Workers Compensation in connection with its investment in the MDL Active Duration Fund.

## INSTRUCTION 25

### Investment Advisers Fraud, 15 U.S.C. § 80b–6

### Intent

In all three sections of the Investment Advisers' Act require that the government prove beyond a reasonable doubt that the defendant acted knowingly, willfully and with the intent to defraud, deceive, or manipulate the Ohio Bureau of Workers' Compensation in connection with its investment in the MDL Active Duration Fund.

The question of whether a person acted knowingly, willfully with intent to defraud, deceive or manipulate is a question of fact for you to determine like any other fact question. This question obviously involves someone's state of mind.

I want to explain something about proving a defendant's state of mind.

Ordinarily, there is no way that a defendant's state of mind can be proved directly, because no one can read another person's mind and tell what that person is thinking.

Direct proof of knowledge and fraudulent, deceitful, or manipulative intent is almost never available. It would be a rare case in which evidence was presented that a person wrote or stated that as of a given time in the past, he committed an act with such intent. However, such direct proof is not required.

But a defendant's state of mind can be proved indirectly from surrounding circumstances. This includes things like what the defendant said, what the defendant did, how the defendant acted, and any other facts or circumstances in evidence that show what was in the defendant's mind.

You may also consider the natural and probable results of any acts that the defendant knowingly did [or did not do], and whether it is reasonable to conclude that the defendant intended those results. This of course, is all for you to decide.

### Reckless Disregard

The government can also meet its burden of showing that the defendant had the requisite intent required to perpetuate fraud or deceit on the OBWC if you find beyond a reasonable doubt that the defendant acted with deliberate disregard in conducting transactions, practices and courses of business regarding the use of leverage in excess of 150% in the ADF and concealing and failing to disclose to the full

extent his exercise of leverage in excess of 150% or with conscious purpose to avoid learning the truth.

If the government establishes that the defendant acted with deliberate disregard for the truth, the knowledge requirement would be satisfied.

### INSTRUCTION 26

### Investment Adviser Fraud, 15 U.S.C. § 80b–6

### Use of Mails or Other Means or Instrumentalities of Interstate Commerce

The final element that the government must establish beyond a reasonable doubt as to Count 1 for all three sections of the Investment Advisers' Act is the use of interstate mail or wire communications in furtherance of the fraudulent, deceptive, or manipulative conduct alleged in the Superseding Indictment.

It is not necessary that the defendant be directly or personally involved in the mailing. If the defendant was an active participant in the scheme and took steps or engaged in conduct which he knew or could reasonably foresee would naturally and probably result in the use of mails or interstate wires, then you may find that he caused them to be used.

When one does an act with the knowledge that the use of interstate means of communications will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he causes such means to be used.

It is not necessary that the items sent through the mails concern the fraudulent material or anything criminal or objectionable. The matter mailed or sent by wire may be entirely innocent.

With respect to the use of the use of the mails need not be central to the execution of the scheme and may even be incidental to it. All that is required is that the use of the mails bear some relation to the object of the scheme or fraudulent conduct.

Also, the government must establish beyond a reasonable doubt a particular mailing or wiring charged in the Superseding Indictment in Count 2 will be described to you later at pages 52 through 54. However, the use of the mails can be proved through circumstantial evidence. Proof of a routine personal, office or business practice of using the mail is sufficient to support a jury's determination that mailing occurred in a particular instance. Similarly, evidence suggestive of a delay in time consistent with mailing between the time a letter or check was prepared and when it was received may be a sufficient basis to find that a mailing occurred.

In addition, the government does not have to prove that the mailings or wirings were made on the exact date charged in the Superseding Indictment. It is sufficient if the evidence establishes beyond a reasonable doubt that the mailing was made on a date substantially similar to the date charged in the Superseding Indictment.

### APPENDIX 4

### IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF OHIO

### EASTERN DIVISION

United States of America, Plaintiff,

v.

Mark D. Lay, Defendant.

Case No. 1:07CR339

Judge David D. Dowd, Jr.

Magistrate Judge James S. Gallas

PROPOSED JURY INSTRUCTIONS

Richard M. Kerger (0015864)

Kerger & Associates

33 S. Michigan Street, Suite 100

Toledo, Ohio 43604

Telephone: (419) 255–5990

Fax: (419) 255–5997

Percy Squire (0022010)

514 S. High Street

Columbus, OH 43215

Telephone: (614) 224–6525

Counsel for Defendant Mark D. Lay

Now comes defendant and submits his proposed jury instructions as follows:

***Jury Instruction No. 1.*** I have determined that the defendant had a fiduciary obligation to the Ohio Bureau of Worker's Compensation. The Government claims that he violated that fiduciary duty by unlawfully, willfully and knowingly using or causing to be used the mails and wires and other means of instrumentality of interstate foreign commerce, directly and indirectly, to:

1) Employing devices, schemes and artifices to defraud the Ohio Bureau of Worker's Compensation.

2) Engaging in transactions and practices which operated as a fraud and deceit upon the Ohio Bureau of Worker's Compensation.

3) Engaging in acts and practices which were fraudulent, deceptive and manipulative. In particular the Government has alleged the defendant has exercised leverage in excess of 150% in the Active Duration Fund, then concealed and failed to disclose the full extent of his leverage in excess of 150%.

In order to find the defendant guilty of this conduct, you must unanimously find that the above statements are true beyond a reasonable doubt.

Language of the Indictment.

***Jury Instruction No. 2.*** In order for the defendant to be convicted of mail or wire fraud, the Government must prove:

1) The defendant knowingly devised or participated in a scheme or plan to defraud or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations or promises.

2) The statements made or the facts omitted as a part of the scheme were material.

3) The defendant acted with the intent to defraud.

4) That in advancing or furthering or carrying out the scheme, the defendant used the mails or wires or caused the mails or wires to be used.

*United States v. Woods*, 335 F.3d 993 (9th Cir.2003).

***Jury Instruction No. 3.*** In order to convict the defendant of wire fraud, you must find that the defendant made up a scheme or plan to defraud and to obtain money from the Ohio Bureau of Worker's Compensation by means of false promises or statements, with all of you agreeing on at least one particular false promise or statement that was made. This finding must be unanimous.

*U.S. v. Travers*, 114 Fed.Appx. 283 (9th Cir.2004).

***Jury Instruction No. 4.*** In order to establish the defendant's guilt, the Government must show the specific intent to defraud.

*United States v. Manion*, 339 F.3d 1153 (9th Cir.2003).

***Jury Instruction No. 5.*** All deceptive or misleading statements, false statements

and half truths, which are generally referred to as statements and concealed, omitted and non-disclosed facts, which we collectively refer to in these instructions as the facts, must be material to form the basis of mail or wire fraud charges. A statement or omitted fact is material if it is of a kind which would reasonably influence a person to part with money or property.

*United States v. Woods*, 335 F.3d 993 (2003).

***Jury Instruction No. 6.*** Defendant has introduced evidence of his good general reputation for truth, veracity, honesty and integrity. Character evidence may give rise to reasonable doubt since you may think it improbable that a person with good character with respect to these traits would commit such a crime.

*United States v. John, Jr.*, 309 F.3d 298 (5th Cir.2002).

Respectfully submitted,

*/s/ Richard M. Kerger*
RICHARD M. KERGER (0015864)

*/s/ Percy Squire*
PERCY SQUIRE (0022010)

Counsel for Defendant Mark D. Lay

### CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been electronically filed this 11th day of October, 2007. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's System.

/s/ Richard M. Kerger

## APPENDIX 5
### Lay Trial Witness Log

| Witness | Examination | Date | Docket # | Volume/ transcript page |
|---|---|---|---|---|
| **Government** | | | | |
| Robert Lang | direct | 10/15/07 | 126 | Vol. 1/pp. 1–108 |
| | direct | 10/16/07 | 127 | Vol. 2/pp. 109–174 |
| | cross | 10/16/07 | 127 | Vol. 2/pp. 174–233 |
| | re-direct | 10/16/07 | 127 | Vol. 2/pp. 233–240 |
| | re-cross | 10/16/07 | 127 | Vol. 2/pp. 240–247 |
| (recalled) | direct | 10/23/07 | 119 | pp. 82–85 |
| | cross | 10/23/07 | 119 | pp. 85–90 |
| Scott Fisher | direct | 10/16/07 | 127 | Vol. 2/pp. 248–257 |
| | no cross | | | |
| Terrence Gasper | direct | 10/16/07 | 102 | pp. 1–84 |
| | direct | 10/17/07 | 102 | pp. 85–103 |
| | cross | 10/17/07 | 102 | pp. 104–154 |
| | re-direct | 10/17/07 | 102 | pp. 154–163 |
| | re-cross | 10/17/07 | 102 | pp. 163–165 |
| | further re-direct | 10/17/07 | 102 | pp. 165–166 |
| | by Court | 10/17/07 | 102 | pp. 166–180 |
| Gary Gluck | direct | 10/17/07 | 128 | Vol. 3/pp. 261–282 |

| | | | | |
|---|---|---|---|---|
| | cross | 10/17/07 | 128 | Vol. 3/pp. 282–286 |
| Michael Donnelly | direct | 10/17/07 | 128 | Vol. 3/pp. 286–315 |
| | cross | 10/17/07 | 128 | Vol. 3/pp. 315–317 |
| | re-direct | 10/17/07 | 128 | Vol. 3/pp. 317–320 |
| Steven Mahoney | direct | 10/17/07 | 128 | Vol. 3/pp. 320–337 |
| | direct | 10/18/08 | 143 | Vol. 4/pp. 343–345 |
| | cross | 10/18/08 | 143 | Vol. 4/pp. 345–348 |
| Stephen McMorran | direct | 10/18/08 | 143 | Vol. 4/pp. 348–361 |
| | cross | 10/18/08 | 143 | Vol. 4/pp. 361–367 |
| | re-direct | 10/18/08 | 143 | Vol. 4/pp. 367–368 |
| | re-cross | 10/18/08 | 143 | Vol. 4/pp. 368–369 |
| Lee Fensterstock | direct | 10/18/08 | 143 | Vol. 4/pp. 369–389 |
| | cross | 10/18/08 | 143 | Vol. 4/pp. 389–391 |
| | re-direct | 10/18/08 | 143 | Vol. 4/pp. 391–393 |
| J.R. Cabrera | direct | 10/18/08 | 143 | Vol. 4/pp. 393–426 |
| | cross | 10/18/08 | 143 | Vol. 4/pp. 426–436 |
| | re-direct | 10/18/08 | 143 | Vol. 4/pp. 436–437 |
| | re-cross | 10/18/08 | 143 | Vol. 4/p. 437 |
| James McLean | direct | 10/18/07 | 100 | pp. 2–144 |
| | cross | 10/19/07 | 101 | pp. 147–190 |
| | re-direct | 10/19/07 | 101 | pp. 190–204 |
| | re-cross | 10/19/07 | 101 | pp. 204–214 |
| | further re-direct | 10/19/07 | 101 | pp. 214–215 |
| | further re-cross | 10/19/07 | 101 | pp. 215 |
| Dominick Buonocore | direct | 10/19/07 | 132 | Vol. 5/pp. 441–449 |
| | cross | 10/19/07 | 132 | Vol. 5/pp. 449–450 |
| Michael Simmerly | direct | 10/19/07 | 132 | Vol. 5/pp. 452–464 |
| | cross | 10/19/07 | 132 | Vol. 5/pp. 464–467 |
| Geoffrey Stafford | direct | 10/19/07 | 132 | Vol. 5/pp. 467–536 |
| | direct | 10/23/07 | 119 | pp. 2–5 |
| | cross | 10/23/07 | 119 | pp. 5–15 |
| Jeremy Durgin | direct | 10/23/07 | 119 | pp. 15–72 |
| | cross | 10/23/07 | 119 | pp. 72–81 |
| | re-direct | 10/23/07 | 119 | pp. 81–82 |
| Sophia Smith | direct | 10/24/07 | 120 | pp. 143–170 |
| | cross | 10/24/07 | 120 | pp. 170–171 |

**Defendant**

| | | | | |
|---|---|---|---|---|
| Frederick Zigler | direct | 10/24/07 | 120 | pp. 184–203 |
| | cross | 10/24/07 | 120 | pp. 203–205 |
| | re-direct | 10/24/07 | 120 | pp. 205–207 |
| Brian Sommers | direct | 10/24/07 | 120 | pp. 207–214 |
| | cross | 10/24/07 | 120 | pp. 214–225 |
| | re-direct | 10/24/07 | 120 | pp. 225–226 |
| | re-cross | 10/24/07 | 120 | pp. 226–229 |
| Antoine Smalls | direct | 10/24/07 | 120 | pp. 229–258 |
| | cross | 10/24/07 | 120 | pp. 258–268 |
| | re-direct | 10/24/07 | 120 | pp. 268–272 |
| | re-cross | 10/24/07 | 120 | pp. 272–274 |